**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>   **-v.-**<br><br>**LEWIS STAHL,**<br><br>   **Defendant.** | **1:18-cr-00694-RA** |

**FIRST AMENDED MOTION FOR RECONSIDERATION OF SENTENCING,**
**FILED PURSUANT TO RULE 35(a) FED. R. CRIM. P.**
**ON BEHALF OF LEWIS STAHL**

Defendant, Lewis Stahl, by and through the undersigned counsel, files this First Amended Motion For Reconsideration Of Sentencing, Pursuant To Rule 35(a) Fed. R. Crim. P. On Behalf of Lewis Stahl, and states:

On March 26, 2019 this Court orally announced judgment of Defendant, Lewis Stahl. A transcript of those proceedings has been attached hereto and is referenced below. *Exh. 1, Transcript.* Written rendition of judgment and sentence was filed on April 1, 2019 [DE 19] conforming to this Court's oral announcement of sentence. The terms of sentence included, inter alia, Stahl's imprisonment of 30 months to the Bureau Of Prisons. *Id.*

Defendant files the instant motion pursuant to Rule 35(a) requesting reconsideration of sentencing based upon *other clear error* within the jurisdictional parameters of Rule 35(a) Fed. R. Crim. P., infra. Defendant hopes that this Court will grant a timely rehearing on sentencing for the limited purposes delineated below, specifically for reconsideration of sentence not above the average prison length of 21 months for the nineteen (19) similarly situated offenders sentenced under 2T1.1 with a base offense level of 24, with a 3 level decrease for acceptance of responsibility, final offense level of 21, and a criminal history category of 1. During fiscal years 2013-2017, in

"U.S. Sentencing Commission, 2013-2017 Datafiles, USSCFY13-USSCFY17"; provided by the Court to counsel during Lewis Stahl's sentencing for the first time.

The Court stated:

"THE COURT: Look, I, of course, agree with the general premise that every case needs to be considered on its own. I will tell you that I reached out to the Sentencing Commission, and I'm happy to provide the information that I received, and if you want more, it's just a one-page chart, so maybe I'll have that printed right now, and I will give it to each side. But it's essentially selected sentencing information for offenders sentenced under this provision, 2T1.1, with a base offense level – a final offense level of 21, so a base offense level of 24, with a three-level decrease for acceptance of responsibility. The sentence length of all offenders was an average of 21 months, 38 -- why don't I print it for you. So, for all offenders, the average months was 21 months, and then it lists what percentage were in the sentencing guideline range, which warrant – what percentage had substantial assistance motions and the like. So, if you want to take a minute and look at that, you can do so. In any event, I agree with the basic premise that we have to look at every case on its own while considering the guidelines.

MS. KELLMAN: Thank you, Judge." [Sentencing Transcript, pps. 20-21]

The Sentencing Commission printout was then provided to counsel by the Court, as attached hereto. *Exh. 2, Sentencing Commission printout*. Counsel for Lewis Stahl did not have a meaningful opportunity to discuss this printout, or the sentencing data or statistics cited therein with Lewis Stahl and was further unable to meaningfully examine the document for purposes of making competent argument, or even commenting on, its application to Lewis Stahl's instant sentencing. Lewis Stahl claims that he was prejudiced by lack of notice, which constitutes other clear error, pursuant to Rule 35(a) Fed. R. Crim. P., based upon the caselaw cited below, for which Lewis Stahl is entitled to reconsideration from this Court.

The Court did consider the Sentencing Guidelines printout for purposes of Lewis Stahl's sentencing, but stated that the printout was "not that helpful":

"So, I must, and will, consider all those factors and the others raised, including the need to avoid unwarranted sentencing disparities. I considered both the charts, the arguments that you made. I also considered the page that I got that I gave to you

from the sentencing commission, which really only has a very limited amount of information, so *it's not that helpful*, but it indicates that 21 percent of the time, a sentence was imposed within the guidelines range for this particular level and this particular guideline provision, 2T1.1. So, I have considered that, as well as the average and median sentences in those cases." [Sentencing Transcript, p. 50] [italics added]

Had counsel conferred with Defendant regarding the printout, they would have been instructed to argue that in light of the Judge's oral finding regarding the Defendant's non-criminal and charitable background, a sentence not in excess of the average would be more appropriate then a sentence exceeding the average by 9 months. Defendant seeks an opportunity to make that argument now.

Lewis Stahl moves this Court for rehearing on Monday, April 8, 2019, and an opportunity to argue the data included in the printout that the Court presented to counsel, and for reconsideration of sentence to no more than the average prison sentence of 21 months; as Lewis Stahl was not provided a meaningful opportunity to present argument why this data was helpful and should have been given greater weight at his sentencing.   Attached hereto is *Exh. 3, Court Printout Data Analysis*.

Rule 35(a) Fed. R. Crim. P. provides in pertinent part:

"Rule 35. Correcting or Reducing a Sentence

(a) Correcting Clear Error. Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or *other clear error*." *Id*.

Lewis Stahl claims that lack of prior notice regarding the sentencing commission document considered by this Court at his sentencing constitutes *other clear error* within the ambit of Rule 35(a) conferring jurisdiction to this Court for reconsideration of sentencing, at least included in the outer boundaries of other clear error, as described below.

The authority to correct a sentence under Rule 35(a) is intended to be very narrow and to extend only to those cases in which an obvious error or mistake has occurred in the sentence, that is, errors which would almost certainly result in a remand of the case to the trial court for further action under Rule 35(a). Fed. R. Crim. P. 35 advisory committee note (1991). *United States v.*

*Goddard*, 2018 WL 4440503 (SDNY 9/17/18), citing *United States v. Abreu-Cabrera*, 64 F.3d 67, 72 (2d Cir.1995). See also *United States v. DeMartino*, 112 F.3d 75, 79 (2d Cir.1997).

Although there are no reported cases in this Circuit regarding whether the issue presented by Lewis Stahl constitutes *other clear error* within the meaning of Rule 35(a), other U.S. Circuits have been reluctant to demarcate the outer boundaries of 'other clear error' within the meaning of Rule 35(a), other than by examining the error claimed on a case by case basis. *United States v. Ross*, 557 F.3d 237, 239 (5th Cir. 2009).

In *United States v. Rosner*, 549 F. 2d 259 (2nd Cir. 1977), defendant's case was remanded for resentencing because although the trial court's reliance on the government's sentencing memorandum was not improper, defense counsel was not given an opportunity to rebut extraneous allegations of other wrongdoings contained in the memorandum. *Id.* Defense counsel was provided the government's memorandum in court and did not have a meaningful opportunity to prepare or to rebut ancillary allegations made, considered by the trial court. See *Id.* Although *Rosner* was not a Rule 35(a) case per se, it does present a footprint of the type of "errors which would almost certainly result in a remand of the case to the trial court for further action under Rule 35(a)" *Goddard*, *Abreu-Cabrera*, *DeMartino*, supra.

In substance, the claim of prejudice in *Rosner*, supra, sounding in lack of prior notice at sentencing, is similar to the claim of prejudice made here by Lewis Stahl, in that Lewis Stahl was not given a meaningful opportunity to present argument regarding the U.S. Sentencing Commission, 2013-2017 Datafiles, USSCFY13-USSCFY17 to make sound argument to this Court why he should not be sentenced above the 21-month average for similarly situated defendants.

This Court has jurisdiction to grant rehearing, and Defendant requests the hearing on Monday, April 8, 2019. On April 10, 2019, this Court will lose jurisdiction to consider these requests made by Lewis Stahl, notwithstanding whether the Motion is timely filed, but unheard, before expiration of the 14th day. The 14-day time limit is a strict jurisdictional time limit. *United States v. Oleksowicz*, 2017 WL 729724 (SDNY 2/24/17); *United States v. Sarvestani*, 297 F.R.D. 228, 229 (SDNY 2014); *United States v. Munoz*, 2014 WL 2566263 (EDNY 6/6/14), see also Rule 35(c) Fed. R. Crim.P.(Sentencing means oral announcement of sentence).

**WHEREFORE LEWIS STAHL**, by and through the undersigned counsels, respectfully moves this Court for reconsideration of sentencing, limited to argument regarding the one page document titled "US Sentencing Commission, 2013-2017 Datafiles, USSCFY 13-USSCFY17", provided by this Court to counsel and considered by this Court at sentencing, such that Lewis Stahl would be permitted to present argument why he should be sentenced to no more than the 21 month average punishment cited therein; and further, for rehearing to be scheduled on Monday, April 8, 2019, while this Court still retains jurisdiction pursuant to Rule 35(a) Fed. R. Crim. P.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this **7th day of April, 2019**, a true and correct copy of the foregoing motion with attachments was furnished by ECF transmission to: AUSA Jennifer A. Beidel, and AUSA Sara E. Paul, United States Attorneys Office-SDNY, One Saint Andrews Plaza, New York, NY 10007.

> LAW OFFICES OF RALPH S. BEHR
> 2151 N.W. Boca Raton Blvd, Suite 100
> Boca Raton, Florida 33431
> Tel: (561) 717-3000
> Fax: (954) 761-1526
> Email: rb.behrlaw@gmail.com
>
> BY*: /s/* Ralph S. Behr
>     RALPH S. BEHR, ESQUIRE
>
>
> ALAN DERSHOWITZ, ESQUIRE
> 1575 Massachusetts Avenue
> Cambridge, Massachusetts 02138
> Tel: (617) 319-9892
> Email: dersh@law.harvard.edu
>
>
> By: /s/ Alan Dershowitz
>     ALAN DERSHOWITZ, ESQUIRE
>     OF COUNSEL
>     PRO HAC VICE
>     Applying for certificate of good standing

LAW OFFICES OF SUSAN KELLMAN
25 Eighth Avenue
Brooklyn, New York 11217
Tel: (718) 783-8200
Fax: (718) 783-8226


By: /s/ Susan Kellman
    SUSAN G. KELLMAN, ESQUIRE
    OF COUNSEL


SCHIFF HARDIN LLP
666 Fifth Avenue, 17th Floor
New York, New York 10103
Tel: (212) 745-0839
Fax: (212) 753-5044
Email: ppileggi@schiffhardin.com


By: /s/ Patricia A Pileggi
    PATRICIA A. PILEGGI, ESQUIRE
    OF COUNSEL


SCHIFF HARDIN LLP
666 Fifth Avenue, 17th Floor
New York, New York 10103
Tel: (212) 745-0839
Fax: (212) 753-5044
Email: bsokoloff@schiffhardin.com


By: /s/ Brittany Sokoloff
    BRITTANY SOKOLOFF
    OF COUNSEL

**ATTACHMENTS**   **Sentencing Transcript March 26, 2019**
                  **U.S. Sentencing Commission, 2013-2017 Datafiles, USSCFY13-17**

# EXHIBIT 1

J3QKSTAS

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                        18 CR 694 (RA)

 5  LEWIS STAHL,

 6                  Defendant.

 7  ------------------------------x

                                      New York, N.Y.
 8                                    March 26, 2019
                                      3:12 p.m.
 9

10  Before:

11                  HON. RONNIE ABRAMS,

12                                      District Judge

13
                         APPEARANCES
14

15  GEOFFREY S. BERMAN,
         United States Attorney for the
16       Southern District of New York
    SARAH PAUL
17       Assistant United States Attorney

18  SUSAN GAIL KELLMAN
         Attorney for Defendant
19       -and-
    SCHIFF HARDIN LLP
20  BY:  PATRICIA A. PILEGGI
         BRITTANY SOKOLOFF
21

22

23

24

25

 1              (Case called)

 2              MS. PAUL:  Good afternoon, your Honor.  Sarah Paul,

 3      for the government.

 4              THE COURT:  Good afternoon.

 5              Everyone can be seated, by the way.  Thank you.

 6              MS. KELLMAN:  Good afternoon, your Honor.  Susan

 7      Kellman, for Lewis Stahl.  My client is present in court, and I

 8      am assisted at counsel table by Patricia Pileggi and Brittany

 9      Sokoloff.

10              THE COURT:  Good afternoon to all of you.

11              This matter -- you can be seated as well -- is on for

12      sentencing.  Mr. Stahl pled guilty in September to tax evasion.

13              In connection with today's proceeding, I have reviewed

14      the final presentence investigation report.  I have two

15      letters, submissions, from the defendant, and one attaches a

16      whole host of letters and personal notes, and I want to thank

17      all of you who submitted letters on Mr. Stahl's behalf.  And I

18      have the government's sentencing memorandum.

19              Is that everything that I need to have reviewed today?

20              MS. PAUL:  I believe so, your Honor.

21              MS. KELLMAN:  Yes, your Honor.

22              THE COURT:  Okay.

23              Let's begin by discussing the presentence report.

24      Ms. Kellman, have you reviewed the presentence report and

25      discussed it with your client?

1          MS. KELLMAN:  Yes, your Honor, I have.

2          THE COURT:  Do you have any objections?

3          MS. KELLMAN:  We do not, Judge.

4          THE COURT:  Okay.

5          Mr. Stahl, have you had enough time and opportunity to

6    review the presentence report and discuss it with your

7    attorneys?

8          THE DEFENDANT:  Yes, I have, your Honor.

9          THE COURT:  Thank you.

10         Does the government have any objections to the report?

11         MS. PAUL:  One objection, your Honor:  On paragraph 15

12   of the report, it notes that Stahl is responsible for a loss to

13   the Internal Revenue Service of 6,300,000 in taxes due and

14   owing.  It should say over 6 million.

15         THE COURT:  Right.  And I know that that number is

16   disputed.  So we'll add the word over there.

17         MS. PAUL:  Yes.

18         THE COURT:  Just while we're on this subject, there is

19   a dispute, and you think the parties will be able to reach that

20   dispute, so with respect to restitution, we don't need to

21   determine that particular figure, whether it's the 6.3 or the

22   8.7 today; is that correct?

23         MS. PAUL:  That's right, your Honor.

24         Just by way of background and for the record, the

25   government's position, based on the facts before it now,

1   continues to be that the tax loss is $8,739,935.  The defense's

2   position is that the tax loss is $6,349,689.  The difference in

3   that figure rests upon whether a certain tax credit is applied

4   for research and development.  The parties have just not been

5   able to resolve whether or not that credit applies.  The

6   defense did come forward with some information to the

7   government, but we just weren't able to make a determination --

8           THE COURT:  It doesn't affect the loss amount either,

9   right?

10          MS. PAUL:  It doesn't.

11          THE COURT:  It just affects restitution, as I

12   understand it.

13          MS. PAUL:  That's right.  And the parties have agreed

14   that the Court need not make the finding.  We think we can

15   proceed without the Court making that finding, and, rather, the

16   IRS will conduct a civil audit and resolve the dispute that

17   way.

18          THE COURT:  Will that be done within the 90-day

19   period?

20          MS. PAUL:  I would have to speak with IRS about that.

21   That would be ideal.

22          THE COURT:  Okay.  So you need to let me know because

23   I've got to issue something within 90 days with respect to

24   restitution.

25          MS. PAUL:  We'll certainly let the Court know.

J3QKSTAS

1          THE COURT:  All right.  Thank you.

2          MS. KELLMAN:  Your Honor, if I can just very briefly

3    be heard on that issue?

4          THE COURT:  Yes, of course.

5          MS. KELLMAN:  Just to be clear, we have done -- and

6    the government's met us halfway.  We've done everything we can

7    to try to resolve the issue.  We presented the government

8    with -- in addition to some documents, with two substantial

9    reports that were prepared by a company called The Alliant

10   Group, who specializes in research and development credits.  We

11   provided the government with an original report and then an

12   updated report.  We've also done something I can't remember

13   doing before, which is offered our client and his entire staff

14   for interviews if the government wanted to interview them.

15   We've also provided them with charts that showed -- I mean,

16   dozens of pages of charts that shows the role that every person

17   played vis-a-vis the credit and why our client is entitled to

18   the credit.

19         So we've done everything we could to try to persuade

20   the government.  It is a complex issue, and, ultimately, we all

21   agreed it was best handled in the civil format, but we've made

22   every effort to resolve it in the context of this case so it

23   wouldn't be outstanding.

24         THE COURT:  Thank you for those efforts.

25         As I said, I think from my perspective, it only

1    affects restitution, and I'll expect to get something, even if

2    it's disputed, and if we need to meet again within the 90-day

3    period after the sentencing, we will do so.

4            First of all, I'll just note that I adopt the factual

5    findings in the presentence report.  The presentence report

6    will be made a part of the record in this matter and placed

7    under seal.  If an appeal is taken, counsel on appeal may have

8    access to the sealed report without further application to the

9    Court.

10            Mr. Stahl, when you pled guilty, we discussed the

11    federal sentencing guidelines.  Do you remember that?

12            THE DEFENDANT:  Yes.

13            THE COURT:  For those of you that are here today that

14    don't know, the sentencing guidelines are in this book right

15    here, they're a set of rules, they're published by the United

16    States Sentencing Commission, and they're designed to guide

17    judges when they impose sentence.  At one time, they were

18    mandatory, meaning judges were required to follow the

19    guidelines.  They're no longer mandatory, they're no longer

20    binding, but judges must consider the guidelines.  So it's

21    important to ensure that we've calculated them properly.

22            As I understand it, the parties agree with the

23    guidelines calculation in the presentence report pursuant to

24    which Mr. Stahl is facing a guidelines range of 37 to 46 months

25    in prison.

1            Based on the parties' agreement and my independent

2     evaluation of the sentencing guidelines, I accept the

3     guidelines calculation in the presentence report.  I find that

4     Mr. Stahl's offense level is 21, his criminal history category

5     is I, and, again, his recommended guideline sentence is 37 to

6     46 months in prison.

7            As I said a moment ago, that range is only advisory.

8     Courts may impose a sentence outside of that range based on one

9     of two legal concepts – a departure or a variance.  A departure

10    allows for a sentence outside of the advisory length based on

11    some provision in the guidelines themselves.  In the plea

12    agreement, both parties agree that no departure from the

13    guidelines range is warranted.  I have, nonetheless, considered

14    whether there is an appropriate basis for departure from the

15    advisory range within the guideline system and while

16    recognizing that I have the authority to depart on a finding of

17    grounds warranting a departure.  I do, though, also have the

18    power to impose a nonguideline sentence based on what we call a

19    variance pursuant to sentencing factors set forth in a

20    provision of the law, it's 18, United States Code, Section

21    3553(a).

22           So with that, I'll hear from the parties.  Would the

23    government like to be heard?

24           MS. PAUL:  Yes, your Honor.  Thank you.

25           May I take the podium?

J3QKSTAS

1          THE COURT:  You may.  Just speak into the microphone,

2     please.

3          MS. PAUL:  Yes.

4          Your Honor, I'd like to start by just responding to

5     some of the arguments made in the second letter by the defense,

6     which the government hasn't had an opportunity to respond to

7     yet.

8          Starting with the chart that the defense attached to

9     their second submission, which I think was in response to our

10    chart, the government's chart, that had listed out what we

11    thought were similarly situated tax cases, where substantial

12    sentences were handed down --

13         THE COURT:  Just to step back for a moment, your

14    chart, in your view, represented what?  All the similarly

15    situated tax cases?

16         MS. PAUL:  Not all of them, but some of them, yes.

17    That was the purpose of our chart.  Recognizing, of course,

18    that every sentencing presents a unique set of circumstances,

19    we thought it would be helpful to the Court to see a chart that

20    included sentencings that we thought were similar cases.

21         The defense responded with a chart that they contend

22    contains similar cases, but the government doesn't agree with

23    that.  These cases -- and I think there are 19 of them cited by

24    the defense -- are really not similar.  They are

25    overwhelmingly -- 16 of them are offshore bank cases, and in

1    these cases, some of the defendants cooperated with the

2    government, which, obviously, was a factor in sentencing.  But

3    there's a larger issue here that I think is important to note

4    for the Court that the government didn't get a chance to brief.

5    The foreign bank account-related prosecutions of the U.S.

6    taxpayers have frequently resulted in below-guideline

7    sentences, and there's a reason for that, which isn't present

8    in this case.  The IRS had a program called the Offshore

9    Voluntary Disclosure Program, and that allowed taxpayers to

10   obtain immunity from prosecution for their hidden offshore bank

11   accounts if they came forward and entered the program before

12   the IRS learned about them.

13        So the program was very successful for the IRS from a

14   compliance standpoint, but from a standpoint of sentencing, it

15   created an issue because you had U.S. taxpayers who were

16   prosecuted for their conduct related to offshore bank accounts,

17   but then there were taxpayers who were in the program whose

18   conduct was just as bad, and sometimes worse in some instances,

19   as that of the charged defendants, and those individuals, by

20   virtue of the program and its existence, didn't get jail time.

21   So I've heard, and I've prosecuted, some of the offshore bank

22   cases myself, and I've certainly heard judges express the

23   concern that if they give a guideline sentence in that case, it

24   creates a disparity because there's a large set of immunized

25   people who committed similar conduct.

1        So that is just a different set of cases that I just

2    don't think it's an appropriate basis for comparison here.

3    This is not a case that involved a foreign bank account.  This

4    is a case of domestic tax evasion.  You don't have that same

5    issue where you have, as a comparison point, a group of

6    similarly situated people who were immunized for conduct that

7    could be described as just as bad.  So just the same concerns

8    don't arise, so I don't think it's really an appropriate point

9    for comparison.

10        I'll note, additionally, in the defense's letter,

11    submitted with that chart, they point to U.S. v. Warner as an

12    example of a case the Court should consider.  There, the

13    guidelines range was 46 to 57 months, but the government

14    actually only recommended a year and a day.  So that's one

15    distinction there.  And then in that case, Warner's defense

16    attorney argued that Warner was similarly situated to Igor

17    Olenicoff.  Olenicoff also appears on the chart.  And

18    Olenicoff, like Warner, was prosecuted for his offshore bank

19    account, and Olenicoff actually cooperated with the government,

20    and in the Olenicoff case, the government recommended three

21    years' probation.  So the defense in the Warner case stood up

22    and said it's essentially not fair to give Mr. Warner a

23    different treatment than Mr. Olenicoff, the conduct was very

24    similar, and, there, the government recommended probation.  So,

25    again, I just don't think that that's a fair point as a case

1    for a comparison.

2         The same with the Dan Horskey case, which is another

3    one that appears on this chart and that the defense cited in

4    their letter.  That's one where the defendant cooperated with

5    the government.  And even there, he actually still got seven

6    months in jail.

7         So these offshore cases are not -- again, I have to

8    underscore they are not -- in the government's view, a fair

9    point of comparison.

10        Of the three remaining cases on the defense counsel's

11   chart, one of them, Michael Gordon, was a cooperating witness,

12   and then the other two, Lawrence Stephenson and Jason Tammen,

13   these are cases that involved unreported income of about

14   $400,000 and a little more than $200,000 respectively.  In this

15   case, the case of Mr. Stahl, we're talking about unreported

16   income -- unreported business income of over $21 million.  It's

17   just not comparable, in the government's view, from a conduct

18   perspective.

19        Turning now to the government's arguments made in our

20   sentencing submission:  I won't repeat all of them here, but I

21   would like to highlight a few of them for the Court's

22   consideration.

23        We do feel a guideline sentence is appropriate in this

24   case, for several reasons:  First, certainly the nature and

25   circumstances of the offense.  As we noted in our sentencing

1  submission, tax fraud is theft from the pockets of every

2  tax-paying citizen of this nation, and as Justice Oliver

3  Wendell Holmes stated, taxes are what we pay for a civilized

4  society.  This is a case with a multiyear tax fraud that caused

5  the U.S. Treasury and honest taxpayers millions of dollars in

6  actual losses.  It was a deliberate offense, and it was

7  long-running in nature.  This was not a one-time mistake.

8  There was a five-year period of time where the defendant was

9  deliberately avoiding filing tax returns, so he could keep tens

10  of millions of dollars in business income hidden from the IRS.

11  He purposely didn't maintain bank accounts in his name because

12  he thought the IRS would try to seize the accounts.  And then

13  he was given a chance, in 2015, to try to fix the problem.  He

14  was approached by an IRS revenue agent, and then in response,

15  Mr. Stahl retained an accountant, and he caused the accountant

16  to submit false delinquent tax returns.

17        Those tax returns didn't report any of the more than

18  21 million he had received in business income.  Instead, they

19  falsely claimed his total income was that of a W-2 employee,

20  which only amounted to a few hundred thousand dollars, and it

21  was only after the defendant was approached by criminal

22  investigation agents from the Internal Revenue Service, about a

23  year or so later, that he finally acknowledged his scheme for

24  counsel.  This is prolonged and serious conduct, and, in the

25  government's view, it does warrant a guideline sentence.

1          Turning to the history and characteristics of the

2     defendant:  The defendant in this case, he enjoyed certain

3     advantages in his life.  He had financial stability.  He's a

4     successful owner of a medical technology company.  He didn't

5     need to commit this crime.  This was a crime driven not by

6     necessity, but by greed.  He had a lot of opportunity in his

7     life.  Clearly, the courtroom is filled with supporters.  He

8     has a network of people who love and support him, and, still,

9     he chose to do this.  Still he chose to steal, and he chose to

10    defraud.

11          We recognize -- we believe the Court should absolutely

12    take into account the letters submitted on his behalf and the

13    fact that he's supported by his family and community, but it

14    doesn't distinguish him from other high-achieving and

15    successful white collar defendants who still, despite their

16    advantages, choose to break the law and to hide that side of

17    himself from the people who love and support them.

18          Turning to the need to afford adequate deterrence --

19          THE COURT:  Can I just stop you there?

20          MS. PAUL:  Yes.

21          THE COURT:  Do you know, in any of the cases that you

22    cited -- I know you said that his situation is not

23    distinguishable from that of other white collar defendants, but

24    looking at those tax cases, did those defendants, had they done

25    as much charitable work and good for their community?  I know

J3QKSTAS

1    every case is different, and it's hard to generalize, but can

2    you speak to that generally?  He does seem like he's done a lot

3    of good in his life and helped a lot of people, and looking at

4    those particular cases on your chart, and having reviewed those

5    transcripts, how would you compare them to this situation?

6            MS. PAUL:  I'll take as an example the Mary Boone

7    case.  I believe we attached the transcript of that sentencing.

8            THE COURT:  Yes.

9            MS. PAUL:  I note in that case -- and that was a very

10   recent case, a recent sentencing in this district, and I know

11   part of the defense's argument in that case was that Ms. Boone

12   had done many good works in her life.  I'm not in a position to

13   cite specifically what they were and how they are similar.

14           THE COURT:  I understand.  And I read the transcript

15   that you provided.

16           MS. PAUL:  Yes.

17           But I think that's a good example of a case where that

18   was an argument advanced by defense counsel, appropriately

19   considered by the court, but also appropriately weighed against

20   the conduct.  And Ms. Boone's conduct was very serious.  The

21   court recognized that it was very serious, and the court also

22   applied the considerations that I think apply equally here,

23   about it being a criminal tax case and the need, the critical

24   need, for general deterrence in such a case.

25           So I think that case is a good point of comparison

1   because it was recent, and similar arguments were made, and the

2   conduct was similarly serious.  In fact, I'd argue, in some

3   ways, this conduct is more serious because of the total amount

4   of the loss, which we at least agree is over 6.3 million.  In

5   the Boone case, it was over 3 million.

6          On the point of deterrence, your Honor:  As we noted

7   in our sentencing submission, a recent IRS study of tax

8   compliance estimates that only 83.1 percent of individuals are

9   compliant with their tax obligations, causing a yearly tax gap

10  of over $458 billion in unreported and uncollected taxes.  That

11  means that hundreds of billions of dollars are lost every year

12  because people are shirking their responsibilities as

13  taxpayers.  It's very important that meaningful sentences be

14  given in cases like this so as to warn others of the

15  consequences of engaging in such conduct.  And in criminal tax

16  cases, your Honor, it's particularly important because criminal

17  tax prosecutions are still relatively rare, but they are

18  vitally important.  They protect the public interest by

19  preserving the integrity of the nation's tax system.

20         The defendant here has asked for a sentence of

21  probation, which the government submits would fail entirely to

22  serve the goal of general deterrence.  It would, in our view,

23  send a message to the community that tax fraud is just no big

24  deal, it's not worthy of serious punishment at all, all one has

25  to do is pay one's back taxes, and nothing else will happen,

1  and that's just not the message the government believes should

2  be sent here.

3        As Judge Hellerstein has noted, the obligation to pay

4  taxes, it's basic to our civilization.  It makes it possible to

5  have a lawful society.  If people don't pay their taxes, they

6  cheat each other.  Your not paying taxes cheats me.  If I don't

7  pay my taxes, I cheat you.  You're ripping off everybody else

8  by not paying your share of taxes, and you can't just make it

9  good by paying the back tax.  We think that's a very important

10 consideration here.

11       And then the last point I'll make on the reasons we're

12 advocating for a guideline sentence is the need to avoid

13 unwarranted disparities.  And I do feel that a sentence of

14 probation in this case, with the guidelines range being 37 to

15 46 months, would result in an unwarranted sentencing disparity.

16 And we point, again, to our chart of recent tax cases as a

17 relevant point of comparison, and as we noted in our

18 submission, it's not uncommon for defendants who are less

19 culpable than Mr. Stahl to receive and serve lengthy sentences

20 of incarceration.

21       Now just turning briefly to some of the arguments made

22 by the defense:  They argued that the defendant's family

23 responsibilities are such, that he cannot be incarcerated.  As

24 we noted, it seems that there are other family members who can

25 fulfill those responsibilities, particularly with respect to

1    Bernie Stahl, as needed while Mr. Stahl's serves the sentence

2    for his crimes.  I've not heard from defense as to why Jeffrey

3    Stahl, Mr. Stahl's twin brother, who actually lives in the same

4    town as Bernie Stahl, couldn't be available to assist as

5    needed.  So we think the family responsibilities of the

6    defendant really shouldn't be a bar to a sentence of

7    incarceration here.

8            The defense has also argued that the defendant needs

9    to -- cannot be incarcerated because he needs to continue

10   running his company.  The government just hasn't seen any

11   evidence that the company would shut down if Mr. Stahl were to

12   be incarcerated.  We're not saying it wouldn't have some

13   effect, certainly, but the idea that it would shut down just

14   does not seem to be supported, especially when there are many

15   other people involved in the company, including his own family

16   members, who seem like they could continue running the business

17   in his place.

18           Finally, on the point of acceptance of responsibility:

19   The defense has argued that he has paid his back taxes, he's

20   accepted responsibility, but, again, that does not make a

21   sentence of probation appropriate.  In our view, he should not

22   get a get-out-of-jail-free card because he's in a position

23   where he can pay his back taxes, where he can make restitution

24   payments prior to sentencing.

25           So, unless the Court has any other questions, I'll

1  just reiterate that we do feel a sentence within the guidelines

2  range of 37 to 46 months in prison is warranted and that a

3  sentence involving minimal or no jail time would send entirely

4  the wrong message to the defendant and to the public.

5       THE COURT:  Thank you.

6       MS. PAUL:  Thank you, your Honor.

7       THE COURT:  Ms. Kellman?

8       MS. KELLMAN:  Thank you, Judge.

9       I know this is going to sound like a strange thing to

10  start with since we submitted a chart, and the government

11  submitted a chart, but I would submit, your Honor, these charts

12  are of very limited use.  I say that because, as the government

13  points out, and as all we know, every case stands on its own.

14  And with every case the government cites in its chart as being

15  exemplary or somehow comparable to the case before your Honor

16  at the moment, I would just very briefly point out, for

17  example, in the case of Morris Zimmerman, there was

18  $120 million tax situation there, there were three IRS audits,

19  and the tax loss was over $45 million.  And I would submit to

20  your Honor that that's hardly a comparable case.

21       More to the point -- and this is not on their chart,

22  I'm not sure why, but within their own brief, the government

23  cites the Trupin case and says that that's a perfect example

24  for the Court as to why this defendant should face jail,

25  because Trupin faced jail, and it was a very similar situation.

1    Well, it really wasn't even close to a very similar situation.

2    First of all, Mr. Trupin went to trial, and he maintained his

3    innocence during the period of a three-month trial.  That's

4    certainly not the case here.  Mr. Stahl agreed to enter a

5    guilty plea before he even met a U.S. Attorney, before there

6    was any offer on the table.  He let it be known right upfront

7    that he was going to take responsibility as soon as the special

8    agent contacted him.

9         More to the point, Mr. Trupin, also even at

10   sentencing, said that he hadn't done anything wrong, did not

11   accept responsibility.  And, additionally, unlike Mr. Stahl, he

12   had a prior conviction for a theft of a Marc Chagall painting.

13   So to suggest they are similarly situated is not even close

14   and, again, brings us back to the point, which is every case

15   really does need to be judged on its own.

16        THE COURT:  Look, I, of course, agree with the general

17   premise that every case needs to be considered on its own.  I

18   will tell you that I reached out to the Sentencing Commission,

19   and I'm happy to provide the information that I received, and

20   if you want more, it's just a one-page chart, so maybe I'll

21   have that printed right now, and I will give it to each side.

22   But it's essentially selected sentencing information for

23   offenders sentenced under this provision, 2T1.1, with a base

24   offense level -- a final offense level of 21, so a base offense

25   level of 24, with a three-level decrease for acceptance of

J3QKSTAS

1  responsibility.

2       The sentence length of all offenders was an average of

3  21 months, 38 -- why don't I print it for you.  So for all

4  offenders, the average months was 21 months, and then it lists

5  what percentage were in the sentencing guideline range, which

6  warrant -- what percentage had substantial assistance motions

7  and the like.  So if you want to take a minute and look at

8  that, you can do so.

9       In any event, I agree with the basic premise that we

10  have to look at every case on its own while considering the

11  guidelines.

12       MS. KELLMAN:  Thank you, Judge.

13       I just wanted to also comment, since the government

14  pointed to the Boone case, which is a relatively recent case in

15  this district, that unlike Mr. Stahl, Mary Boone had one adult

16  son who didn't depend on her, he was independent and an adult.

17  She was the owner of an art gallery, didn't have the same kind

18  of work history, didn't have the number of employees that our

19  client has, didn't have --

20       THE COURT:  But he does have a lot of other employees.

21  He has other people, including those in his family, who can

22  handle the business.  He has other family members that can help

23  with his brother.

24       MS. KELLMAN:  Yes and no, Judge.  I'd like to be heard

25  about those things.

1              THE COURT:  Of course.

2              MS. KELLMAN:  First, with respect to the business

3       itself, while he does have family members involved, and even

4       people from his extended family, as I'm sure your Honor read,

5       involved, there's nobody who does the job that Lewis Stahl

6       does.  By that, I mean, even his son Evan, who basically runs

7       the day-to-day business of the company, and Vaughn, an

8       employee, who supervises the network engineers, none of those

9       people do what it is that Lewis Stahl does; that is, stay ahead

10      of the market.  He is the person who understands the market, he

11      is the person who understands the direction the market is

12      going, and he's the one who understands what's necessary in the

13      market.

14             And to give your Honor just one concrete example of

15      how that played itself out, and I think it's important, a few

16      years ago, the different states started to impose electronic

17      prescription requirements, and different states imposed

18      different kinds of regulations.  Then the federal government

19      came onboard, and they started to impose the same kind of

20      electronic filing of prescriptions.  It was Lewis who was ahead

21      of that, following all regulations, who figured out that there

22      was a need for a program and a system that would coordinate all

23      of these, so that the states and the federal government would

24      be on the same page, so that everybody could be in compliance.

25      Now, that was way ahead of the curve, and he was able to get in

1    there and get the software done.  He was advising the different

2    governments as to how it was this could best work.  There's

3    nobody in this business who does that.

4         On top of it, Judge, what I have learned, and I had no

5    idea about, is that none of the products that he develops --

6    and over the years, he's developed so many, and they're listed

7    in various forms throughout our memo, but none of those systems

8    or concepts can be patented.  The reason for that -- and I had

9    no idea about this -- is that there's an agreement they can't

10   be patented because anybody else can produce a similar kind of

11   software that accomplishes the same thing, and, therefore, the

12   patent office has never issued patents for these kinds of

13   products, which makes their shelf life incredibly short because

14   within a very short period of time, whatever he's come up with,

15   his competitors come up with, and then it starts to move to the

16   next innovation and the next innovation.

17        THE COURT:  He knew all of this while he was

18   committing the crimes, right?  For the number of years in which

19   he wasn't paying taxes, he knew what the consequences could be

20   if he was caught.

21        MS. KELLMAN:  Your Honor, there's no question about

22   that.  And we wouldn't be here if that wasn't the issue.  At

23   the same time, he has really devoted so much of his life to

24   giving of himself and asking for nothing in return.  And he

25   doesn't give the way some people give with money.  You know,

1    the government says he's been fortunate enough to be blessed

2    with money.  He's blessed with money because he works 22 hours

3    a day.  I mean, I work 22 hours a day, I can't keep up with

4    him.  He is committed to his job, but he's committed to his job

5    because it helps people.  And it helps the people who are in

6    this room.  There are so many people in this room who we found

7    in the most bizarre and unusual circumstances.  There's one

8    young man named Vaughn, who I've written about in the

9    sentencing commission.  Vaughn was 15 years old 30-some-odd

10   years ago when Lewis was working on a rehabilitation program in

11   Harlem, and he started talking to this 15-year-old kid about

12   what he had in mind for his future and what he planned to do.

13   And the kid was hoping that one day he would be able to be a

14   carpenter, and Lewis said:  You seem like a bright kid, why are

15   you going to limit yourself to carpentry?  And he took an

16   interest in this fellow, and this young man now works in Boca,

17   works in his company, and is not just -- he sent him to school

18   to learn networking, to learn computers, to learn programming,

19   and now he's supervises the network programs in the operation.

20            And there are so many Vaughns -- would you stand up?

21            THE COURT:  Thank you for being here today.

22            MR. DALEY:  Thank you, Judge.

23            MS. KELLMAN:  I'm told it's his birthday.

24            THE COURT:  Happy birthday.

25            MS. KELLMAN:  My point, Judge, is that there are so

1    many different people from so many different walks of life, and

2    the one thing they all say is the one thing Lewis has never

3    asked for is a thank you or anything in return except love and

4    friendship, which is what this room is filled with.

5          Mary Boone didn't have this kind of network relying on

6    her.  And I point this out, Judge, because these people will be

7    negatively affected.  And you're right, he should have thought

8    about that at the time he was not filing his tax returns, but

9    he didn't, and that's why we're here.  But when you balance out

10   the good works that he's done, not to get away with it, not to

11   have some judge eventually figure out that he's a good guy, but

12   he did it because it's who he is.

13         You know, one of the things we talk about in our memo,

14   Judge, is this turkey giveaway, and one of the reasons it stood

15   out to me was because I was there this Thanksgiving for that

16   giveaway.  It's the Saturday before Thanksgiving.  And I don't

17   know if your Honor saw the pictures, I'm sure you can, but

18   those turkeys, I will tell you, were not just heavy, they were

19   ice cold, and for six hours, we just kept picking up turkeys

20   and handing them to people whose faces lit up when they got

21   their turkey.  And it wasn't just turkey, you can see how many

22   people were involved, but there were sweet potatoes, and pies,

23   and all the things that help -- all the items that help

24   somebody, a family, have a happy holiday, and he was able to

25   bring that into everybody's home by giving of himself.  And, by

 1  the way, while we were photographing the event at that scene,

 2  it was happening in five other places in Broward County.

 3          So this is a man who really has gone out of his way in

 4  so many, many ways, and to show that to the Court:  One, we've

 5  obviously written about it, but all these people, and I can go

 6  through them if you'd like --

 7          THE COURT:  I've read the submissions very carefully.

 8  I'm happy to hear you out on anything, and it's important that

 9  I consider who he is as a person, but stealing $21 million from

10  the American people is also something I have to consider.  I

11  also have to consider the need to deter others from committing

12  similar crimes and to promote respect for the law.  What kind

13  of message would I be sending if I let Mr. Stahl go home today

14  on probation?

15          MS. KELLMAN:  Well, let's talk about two different

16  things, Judge.  First, specific deterrence, I can virtually

17  guarantee your Honor this will never happen again.  He is just

18  overwhelmed by the pain that he's caused not to himself, but

19  the pain that he's caused other people, the people that he

20  loves and the people who will suffer.

21          Now, the government points out that anybody could take

22  care of Bernie, and that's not the case.  And my client's twin,

23  Jeffrey, is also here today.

24          Jeffrey?

25          His obviously my client's twin brother, but in

1    Jeffrey's letters, and even in Sharon's, his sister, you can

2    see that it was Lewis who's gone out of his way their entire

3    life to include Bernie in their world.  When Bernie couldn't go

4    to the Jewish school that they were going to, because in those

5    days, those schools didn't really recognize handicaps, he went

6    to a private -- a public school, and he was bullied there, and

7    he was treated poorly there.  And it was Lewis who said:  I'm

8    sorry to everybody, but we have to accept Bernie, and we have

9    to make Bernie a part of us.  And when Jeffrey said:  Well, he

10   doesn't speak our language, you know, he doesn't understand, it

11   was Lewis who said -- this was when they were kids -- we have

12   to learn his language, so he can learn to communicate with us.

13   It's been Lewis who calls him three, four, five times a day to

14   make sure that he's fine.  His dream, Bernie's dream, was to be

15   able to live independently.  It was Lewis who made that dream

16   come true.  It was Lewis who let him come to work every day in

17   the business, by the way, Judge, that hasn't needed to be there

18   for the last five years.  All he does is scan documents there.

19   But he's given this man humanity.  He's given him a place to go

20   every day.  Everybody treats him with respect there.  He's the

21   boss' brother, and he's scanning documents and shredding

22   documents.  But this is an expense that my client has taken on.

23          I hear your Honor's point about 22 -- $21 million, of

24   course I do, but unlike so many defendants, our client is now

25   current on his taxes, and he's paid the money that he owed.

1  And that's not an excuse, but it is something that the Court

2  should consider, and I have considered it.  Look, I don't think

3  everyone has the resources to pay that money back, and he does.

4  I also think, as a practical matter, it's easier for a person

5  to be generous when they have funds.  But that being said, I

6  don't doubt for a minute anything that you've said about all

7  the good that Mr. Stahl has done in his life and all the people

8  that he's helped.  I see them here, I read the letters, and

9  that's something that's important for me to consider and factor

10  into the sentence, and I am going to.  But I also have to think

11  about the nature of the crime, and the need to deter others,

12  and the need to promote respect for the law, and the need to

13  provide just punishment.  And, again, I'm asking, what kind of

14  message would I send to kids who have no privileges whatsoever

15  in life who get sent to jail for drug crimes and other crimes

16  every day in this courthouse who don't have those resources,

17  who commit crimes -- and it's not an excuse, but who commit

18  crimes out of need and not out of greed?  What kind of message

19  would I be sending?

20        Well, I think part of the message, Judge, is who this

21  man is, because he wasn't born with the wealth.  When he and

22  his brother were in college, and his father lost his job, it

23  was Lewis who left college because he thought his brother was

24  smarter, and he bought an ice cream truck, and he sold ice

25  cream, and he got a second job because tuition was expensive.

1  He got a second job working as a supervisor, an assistant

2  supervisor, in a plant all night while he sold ice cream all

3  day.  And why?  To better himself?  No.  So his brother could

4  finish college, and then his brother could finish medical

5  school, and his brother is a certified cardiologist today

6  because Lewis didn't have money, didn't just write a check for

7  it, he worked 24/7 to make sure his brother would be able to

8  finish his education.  When he went back to school, he realized

9  it was something he couldn't afford unless he was working, and

10  he left school.  And most of the computer skills that he uses

11  today are skills that he's taught himself over the course of

12  time.

13          So he wasn't born into this money.  He's earned it.

14  He's worked hard every day of his life to earn it.

15          Now, in terms of the message that you send, Judge, of

16  course, it's important, but you have an individual here who,

17  yes, he's given money, and you can say, well, he had money

18  because he wasn't paying taxes, but the people sitting in this

19  courtroom, Judge, he has given to every one of them in such a

20  personal way, in a way that has changed their lives.  Not just

21  Vaughn.  Take someone like Sheldon, who's married to Kessianne.

22  Kessianne was their babysitter years ago, and he took an

23  interest in Kessianne and her family, and learned at some point

24  that Vaughn, her husband, was -- I'm sorry, Sheldon -- Sheldon,

25  her husband, was a manager at Bed Bath & Beyond, and they were

1  downsizing their stores because of Internet activity, and so as

2  a manager, who was earning just under $60,000 a year, Lewis got

3  involved in -- not with his money, but he said why don't you

4  learn a new skill, why don't you go in another direction, and

5  he encouraged him to take a Microsoft course.  Which, yes, he

6  paid for the class, but since then, Sheldon has continued with

7  his studies, and has become a programmer and a networker, and

8  he's a major contributor in their company, and they depend on

9  him, he depends on them.  But he's now not making $57,000 a

10  year, he's making $120,000, and he's able to take care of his

11  family without looking to the government, without looking for

12  help.  That's something that Lewis made possible not by buying

13  it with money that he wasn't paying taxes on, but by taking an

14  interest in someone and believing in them.  And that's what

15  he's done to everyone in this room and said to them, you know,

16  if you want to do better, I can help you.

17          When people in his life were faced with illness, he

18  was there for them.  His sister now, I believe, has five stents

19  or seven stents in her heart.  She's had five life-threatening

20  heart attacks in the last five years.  It was Lewis who sat by

21  her bed.  Jeffrey was busy.  Lewis sat by her bed.  And there

22  are people who have crossed his path over the years with

23  drug-related problems.  He's found programs for them, he's

24  gotten them into programs, he's supported them in these

25  programs, and he's met them at the other side when they've come

1    out.  How many people can say that they've done those kinds of

2    things?

3           Judge, you know the kinds of cases that I've had over

4    the years, and it's very rare that I can stand next to a client

5    and say I wish I could be more like him.  It's very rare that I

6    think as I'm reading these letters, and I think to myself, gee,

7    when I was picking up the turkeys and handing them to the next

8    person in line, and my eyes met with Evan, and Evan just burst

9    into a smile, and I said:  What's on your mind?

10          And he said:  Isn't this great?  Look how happy these

11   people are.  This is what my dad taught us.  He taught us to

12   share.  He taught us to do justice.

13          And I wonder if my kids will say that.  I hope they'll

14   say that.  They'll certainly not say it in the same way that

15   Evan said it that day.  When he looked at me, my whole body

16   shook because I understood that to his core, he believed that

17   doing right and doing good was what he was put on earth for.

18          And he's a young man -- you've read the papers -- he's

19   not without his own struggles, but his father stood by him.

20   And when friends of his father and employees of his father had

21   similar situations, he stood by them.  Standing by you doesn't

22   cost a penny.  It doesn't cheat the taxpayer a penny.  And so

23   when the taxpayer says, well, this guy didn't go to jail, why

24   do I have to go to jail, the answer is because this guy is

25   something special, this guy has gone beyond where other people

J3QKSTAS

go, and it's at his own cost and his own price, it has taken

its own toll on him, and what does he ask in return ever?

Nothing.  He asks nothing.

        And, your Honor, just with respect to the tax problem

alone:  It was three years ago, I believe, that he was

contacted originally by the special agent, and he cooperated

immediately with the criminal investigation.

        THE COURT:  But he didn't cooperate.  Maybe,

technically, you're accurate about the criminal investigation,

but part of what's so troubling here is he just didn't not pay

taxes on $21 million for years, but then when he was

confronted, instead of fessing up and paying the money that he

owed, he lied to his accountant, and he filed false returns.

The notion that this was some temporary lapse is absurd.

        MS. KELLMAN:  That's why we're here, Judge.

        THE COURT:  No, I understand.  I'm just saying, yes,

once it was clear he was absolutely caught, and he had no

defense whatsoever, and he couldn't lie his way out of it, he

was cooperative, okay, I grant you that, but it took us a while

to get there.

        MS. KELLMAN:  But we got there, Judge, and we got

there before the U.S. Attorney's Office was involved.  My

client turned over -- through his then counsel, turned over all

of his financial records, turned over his complete QuickBooks,

he turned over everything that was asked for.  Ms. Pileggi and

1    I met with the criminal investigator on a number of occasions,

2    asked how we could help, what more we could give, and the only

3    instruction from our client was whatever it is they ask for, to

4    be cooperative.  When I say cooperate, I'm using it in that

5    sense --

6                THE COURT:  Yes, I understand.

7                MS. KELLMAN:  -- just to be clear.

8                And then, when you balance some of these cases, one

9    that sticks in my mind always is the important factor of the

10   Trupin case, but also the Ty Warner case.  It's interesting

11   that the government's position is that people hide money

12   overseas get amnesty.  What do you say to the taxpayers then?

13   If you're rich enough to figure out how to get your money into

14   a secret bank overseas, then we'll give you amnesty, so rich

15   people get amnesty.  He didn't hide his money, so he is going

16   to face prison term.  I mean, that's the government's

17   reasoning, and that makes no sense at all.

18               I mean, in my view, he has money that's helping the

19   community, it's working in the community.  And, yes, it should

20   have also been working through the tax department, but to say

21   that rich people who figure out how to hide $93 million --

22   that's an awful lot of money to have offshore -- did not

23   cooperate with the United States Government -- in fact, in the

24   Ty Warner case, the Seventh Circuit had to sustain a subpoena

25   and direct -- after appeals, direct Warner to turn over the

1  documents, and he faced no jail time because, after all, he's

2  got $93 million, but it was hidden overseas, so we'll give him

3  amnesty for that.  That makes no sense.  I'm sure he did good

4  deeds, also, but I think in all the years that I've stood in

5  this space, I have never -- take all my clients put together,

6  you don't have somebody like Lewis Stahl, somebody who I say,

7  you know, to myself will my kids turn out the same way because

8  of the message he sent to his kids?

9       Ms. Pileggi and Ms. Sokoloff had the opportunity to

10  spend a week in Florida talking to his friends, and neighbors,

11  and the people whose lives he's impacted, and it was -- I read

12  a book recently in which the author said that he never really

13  understood what it meant to listen to somebody actually until

14  he had a meeting with Barack Obama, and at that meeting, he

15  said:  When he was finished speaking, the President listened,

16  processed what he was saying, and asked a question about what

17  was being said.  And that made this person think, wow, I

18  thought listening was:  I say something, you say something; I

19  say something, you say something.  Definitely male.  But at the

20  end of the day, he got the sense that the person was listening,

21  and it meant so much to him.  And that's who Lewis Stahl is.

22       There's a fellow by the name here, Joey -- I'm going

23  to wreck your name.

24            MR. DESORMEAUX:  Desormeaux.

25            MS. KELLMAN:  -- Desormeaux.  Mr. Desormeaux is a

Native American, and he has a tattoo on his hand that one day

my client saw on the street and asked him about it. And he

explained that he was a member of the --

Dakota tribe?

MR. DESORMEAUX: Standing Rock Sioux Tribe.

MS. KELLMAN: -- Standing Rock Sioux Tribe, and that

he's actually a great, great grandchild of Sitting Bull. They

talked about it and exchanged ideas about it, and he explained

what he does, and my client explained what he does, and they've

been like brothers ever since.

He supported him emotionally, he supported him

financially when he needed financial help. The man runs a big

business and a successful business, but when he needed help, he

always knew that his brother -- he described them as both being

tribal people, one from an American Indian tribe and one from

the tribe of Israel -- and they see each other as brothers.

That's mind-boggling to me, that there's no ethnic divide,

there's no racial divide, there's no religious divide. It's a

beautiful thing to see. And, yes, he didn't pay his taxes, and

he lied about them. That's why we're here.

So, on balance, where does the Court come out? Is the

message to the populous -- to the poor kid who gets arrested

for selling drugs, is the message to him, as long as you hide

your money overseas, we're going to forgive you? Or is the

message, if you live a good life, and you try your hardest and

do your best, and you help not because you're going to get

something in return -- because every single person describes

Lewis Stahl as selfless, generous, compassionate, supportive,

every person -- we didn't write those letter them, they wrote

them -- and every person felt the same way about him.

I haven't slept, I think, since Saturday because I

wanted to be sure that I'd be able to communicate to you how,

on balance, I think that a jail sentence in a case like this is

just wrong. And one of the things that we would propose to

your Honor is a possible community service sentence.

And Mr. Stahl has been working with a couple, the

Nunez family, and they have adopted a school system in Florida,

the Dillard High School and Elementary School. It's a

population -- it's mostly American population, their reading

proficiency is 29 percent, and Lewis has proposed a plan to

adopt this school, as he did decades ago with Park East

Synagogue, where they needed it a lot less, but Park East,

where the rabbi said, do you think you can get us a computer,

so we can show the kids in the school what computers do, and

Lewis and his son came in, and they installed ten computers,

and then they programmed them, and then they taught people how

to use them, and then they taught the staff, and then they

taught the kids how to use them.

What Lewis has proposed to the Nunez family for the

Dillard School, and they're excited and thrilled about it, is

1    to be able to do a similar thing at the school and to be able

2    to train the faculty -- install the computers, train the

3    faculty, and teach the kids how to use computers.

4         My son is a computer geek, and he's out in California,

5    and he tells me that he has several times proposed to the

6    correctional system out there that if inmates were taught how

7    to code and programming languages, that when they got out,

8    they'd never have trouble finding a job because coding is such

9    a valuable skill these days, and, yet, it doesn't ever get off

10   the ground, and here are kids who are struggling in elementary

11   school and high school, and there's a real potential for them.

12        Your Honor, we've taken the liberty, and I really

13   don't mean to be presumptuous, but to prepare a letter for your

14   Honor, if you want to look at it, just with respect to the

15   proposal and the discussions that we've had.  And, yes, what do

16   you tell the other people who may end up in jail about why this

17   defendant wouldn't end up in jail?  You say because this

18   defendant made an impact in a positive way on so many people's

19   lives.  And one of the ways is by adopting a school like this

20   and committing himself.  I said to him:  Could you do 20 hours

21   a week?  That's a thousand hours a year.

22        He said:  I could do that standing on my head.  That's

23   what I do.

24        And everyone in this room is here to say to you,

25   Judge, that's what he does.

1          There's a police officer who wrote a letter here,

2     Kevin Albanese, and he writes to your Honor, and he says he was

3     a law enforcement officer for 20 years -- he's retired now --

4     his wife had some addiction problems, left him, he got custody

5     of their two-year-old son, and he didn't have a faintest idea

6     what to do.  And he worked, and he couldn't take the kid to

7     work with him as a police officer in Connecticut, and Lewis

8     helped him get daycare and paid for the daycare, but once the

9     kid was in school, he helped him with just parenting, it didn't

10    cost a penny.  But Mr. Albanese considers Lewis his brother.

11    He's somebody who stood by him all these years.  He's retired

12    now, and he credits so much of his success as a single parent

13    to Lewis guiding him along the way.  How many people do we know

14    who do that, not once and not twice, but as a daily diet?

15         Rabbi Brikman is here today, Judge.  The rabbi is a

16    Chabad Rabbi in Brooklyn, in Coney Island, and he took the time

17    to summarize in a sentence for your Honor some of the many good

18    works that he has personally experienced, and none of those

19    have anything to do with all the people from Florida who are

20    here to speak to your Honor.  Those people have to do with

21    smaller projects.  He describes the family circle, and there's

22    a family circle that Lewis supports here and in the Habad down

23    in Florida, and what do they do?  They have volunteers, both

24    high school students and nonstudents, meeting -- going and

25    meeting with people in senior citizen homes and in centers

1   where there are autistic children, something he can relate to.

2   And one of the young women was given a homework assignment:  If

3   you died tomorrow, would anybody miss you?  And she wrote this

4   beautiful essay that I read years ago, but the essay basically

5   said:  Yes, Madeline would miss me.  She's an older woman in a

6   nursing home who had nobody who visited her except this young

7   student from high school, which was part of the family circle.

8           And the rabbi shared that letter with us, and it's a

9   beautiful letter, but those are the kinds of things that Lewis

10   has put himself into.  He's visited these homes.  The people

11   down there have described to us how he never left on Hanukkah

12   without leaving a menorah, he never left on Christmas without

13   leaving a Christmas tree, then he gave the kids bikes, and he

14   then left a gift card so they could buy themselves something.

15   These are small items, but they're small items that have a huge

16   impact.  And, in my view, your Honor, they separate him and

17   distinguish him considerably from everybody who -- everybody

18   else who may go to jail.

19           This is not everybody else.  This is a special human

20   being.  And I stand here saying to your Honor, in as sincere

21   terms as I know, that this is a life worth saving.  The

22   government says easily, oh, anybody could take care of Bernie.

23   Well, anybody can't take care of Bernie, and the person who's

24   always taken care of Bernie is his brother, Lewis.

25           In addition, your Honor, because of the death of his

1    parents and also because there is really no need for an office

2    in New York, the whole family has been planning to bring Bernie

3    down to Florida, and changes for Bernie as an autistic

4    individual are very, very difficult, they have to be handled

5    delicately, and Lewis has taken the time to build an add-on to

6    his home with a separate entrance, so that Bernie has his own

7    apartment and can live independently -- there's a back door, I

8    understand, in case Bernie needs help -- but he's done that to

9    make sure that his brother is safe.

10            Up until recently, Sharon's husband was able to fill

11   the gap and be able to be there for Bernie, but he passed away

12   very suddenly, very recently, and so the family is in an

13   expedited mode to get Bernie down to Florida.  They can't bring

14   Bernie to Florida if Lewis isn't going to be there.  They can't

15   even explain to Bernie where Lewis would be.

16            These are not the kinds of things that -- it's easy to

17   stand up and say anybody can do it, but anybody can't do it.

18   Anybody can't run the business because he's the innovative side

19   of the business, not the mechanical side.  He provides the

20   mechanics as well.  If somebody can't figure out how to program

21   something, he can figure it out, and he can get them by.  But

22   in the day-to-day working of the business, that's not what

23   they're worried about, they're worried about being able to keep

24   the business going because it moves so quickly in their

25   industry, and they can't protect legally anything that they

1   come up with.

2          So his business can't survive, and the people who work

3   for him, the people who have -- he's supported all these years

4   emotionally, personally and, financially won't be able to count

5   on that support anymore.  His family won't be able to count on

6   that support anymore.  And his brother won't be able to count

7   on that support anymore.

8          And, yes, he thought -- he should have been thinking

9   about those things when he filed false tax returns or we

10  wouldn't be here.  I understand that, Judge, and he understands

11  that.  And he kicks himself about it 27 times a day.  Everyone

12  in his family tells us that they have to beg him to stop

13  punishing himself.  You couldn't punish him worse than the way

14  he's punished himself.  That's a Jewish thing, I'm sure.  But

15  at the end of the day, he is not like everybody else, and he

16  can't be compared to everybody else.  And, really, people who

17  have figured out a sneaky way to hide the money offshore

18  shouldn't get amnesty, and people like him, because he didn't

19  think about hiding his money, shouldn't have to go to jail.

20  That makes no senses, and that's part of the government's

21  argument, and it makes no sense.

22         Judge, would you mind if I handed this letter up to

23  the Court?

24         THE COURT:  No.  Go ahead.

25         MS. KELLMAN:  With a copy for the government.

1           (Pause)

2           THE COURT:  Thank you.

3           MS. KELLMAN:  Your Honor, I didn't mean to be

4    presumptuous, but we have been trying to come up with a

5    suggestion that we thought was both meaningful and would

6    provide the kind of good that Lewis has done his whole life and

7    could make a real difference in this community, which really

8    needs to have somebody step in, and the State of Florida hasn't

9    been doing it, and it's something that with computers, he

10   thinks he will be able to move forward.

11          Your Honor, the message is always -- I think the

12   message is the same, that if you commit crimes, your liberty is

13   at risk, and Lewis has understood that from the first day he

14   got a phone call from the special agent.  He understands that.

15   And he's carried himself the same way as he did back then, and

16   that was with a view towards resolving this problem.  He knows

17   he made a mess of things, and he was prepared to throw himself

18   into the middle of it and make it right, and that's what we've

19   all endeavored to do for the last several years, and that was

20   before there was a prosecutor involved, before there was a

21   court involved, before there was a plea offer.  He said, you're

22   right, I'm caught, and I'm going to fix this.  Not I'm going to

23   run away, not I'm going to hide, but I'm going to fix it.  And

24   he's worked very, very hard to fix it.  He's worked very, very

25   hard to get the numbers together, to get the tax together.

It's one of the reasons that we've worked so hard on this
research and development plan.

And I think in the beginning, when we first talked to
the government, they thought that it was absurd, frankly, and
they sort of laughed at us, but over the course of the last
year, we've educated them, I think, and provided them with a
tremendous amount of backup, and I think that in a civil
proceeding, we're hoping we'll succeed, but it wasn't to cheat.
I just want to be clear, that wasn't to cheat anybody.

I think that there are here, Judge, really irrevocable
consequences if Lewis were to go to jail.  One other thing
about the work situation is each employee in the office, they
each have their own job, and they each know their own job, but
they don't know everybody else's job.  There's only one person
there who knows everybody's job, and that is Lewis.  So,
between having to be able to manage everybody else's
workstations in a way and also keep the business going forward,
because this field is moving so, so very quickly -- and not to
mention the fact that what he's done is really advance our
ability to get quality healthcare.  And he's done that, in
large measure, with the help of his brother, who knows what the
needs in the community are, and Lewis has been able to
translate them into something that benefits all of us, frankly,
and addresses -- begins to address the addiction issue.  It's
one thing where the federal government imposes a regulation and

1    says all prescriptions have to be electronic, but all those

2    regulations were inconsistent or incompatible with state

3    systems, and it's Lewis who figured out how to make them

4    unified and bring that kind of protection.  He's dealing with

5    health on a large-scale, Judge.  And if your Honor is convinced

6    that some kind of term of punishment or confinement is

7    appropriate, I'd urge your Honor to consider a term of home

8    confinement, so that he can continue to work, continue to take

9    care of his family, continue to meet the needs of both his

10   employees and his family, and, in particular, his brother, and

11   still be able to do his community service and make a

12   difference, continue to do what he's always done, and that is

13   make a difference in the lives of the people he comes in

14   contact with.

15          The thing that jumped off the page to me, Judge, with

16   every letter was Lewis never wanted anything in return.  He

17   just wanted to be able to help people.  And he was so selfless

18   about it, and it's a word that everybody uses, and how many

19   people do we know who are like that?  He's a special human

20   being, and he messed up.  He messed up big time.  But I'd be

21   proud to call him my friend, and I think that anybody who is

22   lucky enough to share his friendship and share his wisdom is

23   indeed a lucky person.  And if these children at Dillard

24   Elementary School and High School are lucky enough to have him

25   involved in their lives, it can only accrue to their advantage

1    and then, ultimately, to all our advantages.

2          So what do you tell the taxpayer, the population?  You

3    say that when you make a difference in so many people's lives,

4    we can take that into account and not find that the ultimate

5    punishment has to be taking away your liberty, but maybe

6    putting you to work, so you can do something that helps the

7    community.  I think there are so many ways that Lewis has

8    helped and can continue to help, and I just see incarceration

9    as something that just destabilizes everything that he's worked

10   to build not for himself, but for everybody else, everybody in

11   this room.

12         THE COURT:  Thank you very much for that heartfelt

13   presentation.

14         MS. KELLMAN:  Thank you.

15         THE COURT:  Mr. Stahl, is there anything you'd like to

16   say today?

17         THE DEFENDANT:  If I may?

18         THE COURT:  Absolutely.  Just speak into the

19   microphone, so I can hear you.  Thank you.

20         THE DEFENDANT:  Judge Abrams, thank you for the

21   opportunity to speak.  I come before you today to accept full

22   responsibility for my conduct and to ask for your consideration

23   in my sentencing.  Thank you for allowing me to say a few words

24   before you impose sentence.

25         By my conduct, I have failed myself, my family and

friends, my community, and my country in a decision I made four

years ago, to file false tax returns and conceal the income

earned from the technology company that I built with my family

and my extended family, our employees.

I have humiliated myself and harmed all of my loving

family and team members.  I have hurt everyone that means the

most to me, and I will never forget my crime, never forgive

myself, and I will never again commit any criminal act.

I took responsibility for my actions long before I was

charged, and I set to work immediately to set matters right.  I

will always continue to be a valuable and contributing member

of society, because that's who I really am.

I have repaid all of the taxes owed from 2010 through

'14, and I am current in all my taxes, and will always be.  My

commitment will never change.

Since those days, I have engaged a number of

accounting professionals who have made many changes to the

accounting and legal systems in my corporate and personal

systems to ensure that we will always be in compliance with the

law.  Our accountants and lawyers have set up weekly, monthly,

quarterly, and annual reporting systems to ensure all taxes,

filings, and fees are paid correctly and in the proper time

frames, and those systems have been in place since early 2015.

Myself, my staff, and our lawyers and accountants are

ensuring the systems are and will continue to function properly

1   within all legal and accounting guidelines and rules.

2           Throughout my life, I have always cared for my family

3   members and tried to contribute to our community, our society,

4   and our country.

5           My father, who suffered terribly in Nazi Austria,

6   taught our family to respect and support all of our fellow

7   human beings and to respect everyone's contribution to our

8   world as a whole.

9           Dad, I'm sorry.  I've always tried to live by my dad's

10  wisdom, but the actions that I now stand in judgment for were

11  terrible -- were a terrible departure from the lessons you

12  taught all of us, and I am so sorry to have let you down.

13          Your Honor, I am remorseful and embarrassed, but I ask

14  to be allowed to continue contributing to our family and our

15  communities.  I am truly a fortunate person, I live in a loving

16  and caring family, and our great country has allowed me to be

17  financially successful and to give back to our society.  My

18  wife, Helene, and my sons, Evans and Jacob, are the most

19  supportive and caring family unit I could ever ask for, and my

20  twin brother, Jeffrey, and my sister, Sharon, have always been

21  there for me, and together, we have always been there for our

22  older brother, Bernie.  I have failed them, but I will never

23  fail them again.

24          I live to give back to our family and society, and I

25  thrive in contributing and seeing our people thrive and achieve

1   personal successes.  My extended family and friends have shown

2   me love, caring, and support, and I thank you all for that.

3   And through the decisions I made that bring me humbly before

4   you today do not merit their support.

5           I have learned and changed from my past terrible

6   actions.  My past actions will never recur, and I promise that

7   my current and future actions will make them proud and make me

8   proud to have their support and loyalty.

9           With humility, Lewis.  Thank you very much.

10          THE COURT:  Thank you very much.

11          Is there any reason sentence cannot be imposed at this

12  time?

13          MS. PAUL:  No, your Honor.

14          MS. KELLMAN:  No, your Honor.

15          THE COURT:  I'm required to consider the advisory

16  guidelines range of 37 to 46 months in prison, as well as

17  various other factors that are set forth in the provision of

18  the law that I mentioned earlier, it's 18, United States Code,

19  Section 3553(a), and I have done so.

20          Those factors include, but are not limited to, the

21  nature and circumstances of the offense and the personal

22  history and characteristics of the defendant, because each

23  defendant must be considered individually as a person.

24          Judges are also required to consider the need for the

25  sentence imposed to reflect the seriousness of the offense,

1    promote respect for the law, provide just punishment, afford

2    adequate deterrence to criminal conduct, protect the public

3    from future crimes of the defendant, and avoid unwarranted

4    sentencing disparities, among other things.

5          Sentencing is the hardest thing I do. It always is.

6    And this is an especially difficult sentencing for me, and I

7    think the reason is because I have before me someone who is a

8    good person, but was not a good citizen. There are a number of

9    things that are not disputed in this case. The first is the

10   conduct. From 2010 to 2014, Mr. Stahl's medical software

11   company earned over $32 million, 21 million after business

12   expenses, for which he failed to pay taxes, and that resulted

13   in a loss to the Internal Revenue Service, and by extension the

14   American people, of between 6.3 and 8.7 million dollars.

15   That's a whole lot of money. Either way, however, the credit

16   for -- research and development credit, either way, that's

17   millions of dollars that could have been spent on roads, or

18   schools, or law enforcement salaries, but, instead, went to

19   pay, in part, for Mr. Stahl's country club benefits, and

20   jewelry, and firearms collection.

21         As I noted earlier, what's especially egregious here

22   is that Mr. Stahl didn't just engage in this conduct and do so

23   for years, but even after he was contacted by the IRS about his

24   failure to file the 1040 forms for all those years, he

25   continued his efforts to lie and cheat to keep that money for

himself.  He hired an accountant, but then lied to that
accountant, so that even when he filed delinquent returns in
May of 2015, they were not just late, but they were fraudulent.

He knew what he was doing.  I don't believe this was a
momentary panic.  This was conduct that lasted for years,
involved filing no returns, followed by filing fraudulent ones.
And there is a real need to promote respect for the law and to
deter others who might similarly be tempted to brazenly avoid
paying taxes by ensuring that they know that serious
consequences will follow if they do so.

There is also no dispute, however, that at the age of
62, Mr. Stahl has primarily lived a law-abiding, charitable
life, supporting not only his family members, but so many
individuals and organizations alike.  And, as I said, I read
all of the letters people submitted, and I can see how much
love and support there is for you, Mr. Stahl, in this
courtroom, and I can see how genuine it is, including from your
lawyer.  You've done a lot of good in your life, and I have to
consider that as well.

It's also true that Mr. Stahl's family and business
will suffer if he's incarcerated.  Sadly, it's often the case
that a defendant's family is the one that suffers sometimes the
most as a result of criminal conduct.  But, as I said earlier,
you must have known that when engaging in such conduct, that
there is a danger to his family and his business, and here, at

least, Mr. Stahl's wife and sons are capable of assisting with
the business and keeping it afloat, even if they can't do
exactly what he did, and he has other family members to help
care for his older brother.

So I must, and will, consider all those factors and
the others raised, including the need to avoid unwarranted
sentencing disparities. I considered both the charts, the
arguments that you made. I also considered the page that I got
that I gave to you from the sentencing commission, which really
only has a very limited amount of information, so it's not that
helpful, but it indicates that 21 percent of the time, a
sentence was imposed within the guidelines range for this
particular level and this particular guideline provision,
2T1.1. So I have considered that, as well as the average and
median sentences in those cases.

Unlike so many of the people I sentence every day, who
come from, and have, almost nothing, you had so much, you have
so much still, as I look around this courtroom, Mr. Stahl, you
had so many privileges and benefits that so many people don't
have, and you, nonetheless, chose to steal millions of dollars
from the American people. And I don't doubt for a minute how
generous you are in your personal life, and that speaks very
well of you as a person, and it's also a welcome thing and a
responsible thing that you paid back all the money that you
owed, but, in my view, that alone can't be a sufficient

1    punishment.  That would send precisely the wrong message about

2    our criminal justice system.  We simply can't have a system of

3    justice where the rich can get out of jail and avoid prison by

4    paying money that they have and the poor cannot.

5            The last thing I'll say is just about tax crimes:

6    They're not victimless crimes.  At naturalization proceedings,

7    when I swear in new citizens, I talk about all the privileges

8    that they'll have as American citizens, but I also talk about

9    the obligations that come with those privileges, and I always

10   specifically mention you need to pay your taxes.  Many of the

11   things that make this country the best country in the world --

12   safe streets, and good schools, and fair and efficient

13   courts -- cost money, and it is your obligation to contribute

14   as required by the law, and you failed to do so not because of

15   a mistake, or even out of need, but out of greed.

16           So I've considered all of that.  I've considered who

17   you are as a person, and I've considered the conduct involved,

18   and all of the factors that I mentioned, and I am ready to

19   impose sentence.  So I am going to ask you to stand, Mr. Stahl.

20           It's the judgment of this Court that you be committed

21   to the custody of the Bureau of Prisons for a term of 30

22   months, to be followed by a term of supervised release of three

23   years.

24           You can be seated, if you'd like, while I read the

25   terms of your supervised release.

1        All the standard conditions of supervised release

2   shall apply.  Unless anyone wants me to, I'm not going to read

3   them out loud.  They're on page 20 and 21 of the presentence

4   report.

5        The mandatory conditions shall apply:  You shall not

6   commit another federal, state, or local crime;

7        You must not unlawfully possess a controlled

8   substance;

9        I'm going to suspend the drug testing condition based

10  on the Court's determination that you pose a low risk of future

11  substance abuse;

12       You must make restitution in accordance with the law

13  and must cooperate in the collection of DNA.

14       I'm going to impose, in light of the nature of the

15  crime, the special conditions recommended by the probation

16  department:  You must provide the probation officer with access

17  to any requested financial information and must not incur new

18  credit card charges or open additional lines of credit without

19  the approval of your probation officer unless you're in

20  compliance with the installment payment schedule.

21       And you will be supervised in the district of your

22  residence.

23       I'm imposing a fine of $75,000, which is to be paid in

24  full no later than 60 days after the date of sentencing, as

25  well as a mandatory special assessment, or fee, of $100.  As we

1   discussed, I understand the parties will submit a proposed

2   restitution order or other materials with respect to

3   restitution within 90 days.

4        Is the government also seeking forfeiture in this

5   case?

6        MS. PAUL:  No, your Honor.

7        THE COURT:  All right.  So there will be no

8   forfeiture.

9        Before I read your appellate rights, I'd like to talk

10  about a surrender date.

11       Ms. Kellman, do you have any suggestions?  It should

12  normally be around 60 days, but if there are any particular

13  obligations or things that he has in the near future, I'm happy

14  to discuss that.

15       MS. KELLMAN:  Your Honor, would it be possible for us

16  to submit a letter to the Court both with a surrender date

17  recommendation and perhaps designation?

18       THE COURT:  Okay.  You can do that.

19       MS. KELLMAN:  Can we do that by Friday?

20       THE COURT:  Okay.  Why don't you do that by Friday.

21  But, again, the surrender date should be approximately 60 days

22  out.

23       That's the sentence of this Court, Mr. Stahl.

24       You have a right to appeal your conviction and

25  sentence except to whatever extent you may have validly waived

1    that right as part of your plea agreement.  If you do choose to

2    appeal, the notice of appeal must be filed within 14 days of

3    the judgment of conviction.  If you're not able to pay for the

4    costs of an appeal, you may apply for leave to appeal

5    in forma pauperis, which simply means the court costs, such as

6    filing fees, will be waived.

7              If you request, the Clerk of Court will prepare and

8    file a notice of appeal on your behalf.

9              I say this a lot at sentencing, and I firmly believe

10   it to be true:  I don't think people need to be defined by the

11   worst mistake that they've ever made.  I don't think you need

12   to be defined by this.  You've done many admirable things in

13   your life, and you have a courtroom filled with people, and

14   many more outside, who love and support you.  I considered what

15   your rabbi wrote, that you understand your decisions were not

16   in line with your core values, that you've expressed remorse,

17   but firm resolve to act differently in the future.  I hope

18   that's true.  I wish you luck with that.  I know you have a

19   difficult time ahead, but I hope that afterwards, you're able

20   to move forward in a law-abiding and productive way.  I wish

21   you luck with that.

22             Are there any other applications at this time?

23             MS. PAUL:  Not from the government, your Honor.

24             MS. KELLMAN:  No, your Honor.

25             THE COURT:  Thank you.   * * *

# EXHIBIT 2

## Selected Sentencing Information for Offenders Sentenced Under §2T1.1 with a Base Offense Level of 24, 3-Level Decrease for Acceptance of Responsibility, Final Offense Level of 21, and a Criminal History Category of I

### Fiscal Years 2013 - 2017[1]

| Total Number of Offenders | | 19 |
|---|---|---|

| Type of Sentence Imposed | Number | Percent |
|---|---|---|
| Prison Only | 17 | 89.5% |
| Probation and Confinement | 2 | 10.5% |

| Sentence Relative to the Guideline Range | Number | Percent |
|---|---|---|
| Within Range | 4 | 21.1% |
| Above Range | 0 | 0.0% |
| §5K1.1 Substantial Assistance | 6 | 31.6% |
| All Other Gov't Sponsored Below Range | 2 | 10.5% |
| Non-Gov't Sponsored Below Range | 7 | 36.8% |

| Sentence Length[2] | Average Months | Median Months |
|---|---|---|
| All Offenders | 21 | 20 |
| Within Range | 38 | 37 |
| Above Range | - | - |
| §5K1.1 Substantial Assistance | 17 | 19 |
| All Other Gov't Sponsored Below Range | 19 | 19 |
| Non-Gov't Sponsored Below Range | 14 | 12 |

| Supervised Release Imposed[3] | Number | Percent |
|---|---|---|
| Supervised Release | 17 | 89.5% |
| No Supervised Release | 2 | 10.5% |

| Term of Supervised Release[4] | Average Months | Median Months |
|---|---|---|
| All Offenders | 25 | 24 |

[1] Only cases with complete guideline application information sentenced under USSG §2T1.1 using a *Guidelines Manual* in effect November 1, 2001 or later were included in this analysis. In addition, the analysis was limited to cases with a base offense level of 24, 3-level decrease for acceptance of responsibility, final offense level of 21, and a Criminal History Category of I. The tax loss table at §2T4.1 was amended effective November 1, 2015.

[2] Calculations of the average include sentences of probation as zero months and any term of confinement as described in USSG §5C1.1. Sentences, supervised release terms, and guideline ranges of life were included in the calculation as 470 months. The Commission does not report average sentence information for categories with fewer than three cases.

[3] Only cases with complete supervised release information were included.

[4] Cases with no term of supervised release imposed were excluded from the calculation of the average term of supervised release.

SOURCE: U.S. Sentencing Commission, 2013-2017 Datafiles, USSCFY13-USSCFY17.

EXHIBIT 3

**Court Printout Data Analysis**

2T1.1 Offenders, Base Offense Level 24-3 Levels = Level 21 Category 1

Years 2013 through 2017 = Nineteen (19) people in that class

---

**Argument:    The Non Government Sponsored Below Range Statistic of   36.8% is wrong.**

Lewis is not in a class of government sponsored offenders or 5k1.1 offenders, and therefore, those statistics must be omitted from the chart to determine a realistic historically significant prison range average for offenders in Lewis' class.

**Computation:**

| | | |
|---|---|---|
| Total | 19 | people in combined class |
| Less: | <2> | government sponsored, below range |
| Less: | <u><6></u> | government sponsored 5k1.1 below range |
| Subtotal | <u>11</u> | people in Lewis' class of offenders (e.g. non government sponsored) |

**Analysis:**

Out of the 11 offenders left in Lewis' class, this was their sentences imposed:

7/11 were non-government sponsored below guidelines to an average of 14 months;

4/11 were non-government sponsored within guideline range to an average of 38 months.

**Percentages:**

7/11 = 64% of people in Lewis' class were sentenced to an average of 14 months; and

4/11= 36% of people in Lewis' class were sentenced to an average of 38 months.