UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br><br>v.<br><br><br>LEWIS STAHL,<br><br><br>Defendant. | **1:18-cr-00694-RA (RA)** |

# MEMORANDUM
# IN SUPPORT OF MOTION
# FOR COMPASSIONATE RELEASE

---

Patricia A. Pileggi
Brittany Sokoloff
SCHIFF HARDIN LLP
1185 Sixth Avenue
New York, New York 10036
Tel: (212) 745-0839
Fax: (212) 753-5044

Attorneys for Defendant Lewis Stahl

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

I.      BACKGROUND ......................................................................................................... 1

II.     THE CORONAVIRUS PANDEMIC ......................................................................... 1

        A.     Rapid Spread of COVID-19 ........................................................................ 2

        B.     Prevention ................................................................................................... 3

        C.     Individuals at Highest Risk ......................................................................... 3

        D.     Vulnerability of Inmates ............................................................................. 5

        E.     Steps Taken by Congress, Courts and Prosecutors to Protect Inmates .................. 7

III.    CONDITIONS AT MIAMI CAMP ......................................................................... 11

IV.    LEWIS STAHL ........................................................................................................ 12

V.     THE FIRST STEP ACT ............................................................................................ 13

        A.     Extraordinary and Compelling Reasons Warrant a Reduction Sentence ............. 14

        B.     The Sentence Reduction is Consistent with the Section 3553(a) Factors ............ 17

        C.     A Sentence Reduction Is Consistent with Sentencing Commission Policy ......... 19

        D.     A Sentence Reduction Is Consistent with Attorney General Barr's Directive .................................................................................................... 19

VI.    UNREASONABLE RISK OF EXPOSURE TO COVID-19 IS CRUEL AND UNUSUAL PUNISHMENT .................................................................................... 20

CONCLUSION ................................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Kramer*,
  2016 U.S. Dist. LEXIS 115024, 2016 WL 4613360 (E.D. Cal. Aug. 17, 2016).....................21

*Brown v. Mitchell*,
  327 F. Supp. 2d 615 (E.D. Va. July 28, 2004).........................................................................21

*Carroll v. DeTella*,
  255 F.3d 470 (7th Cir. 2001) .................................................................................................21

*Crawford v. Coughlin*,
  43 F. Supp. 2d 319 (W.D.N.Y. 1999) .....................................................................................21

*Helling v. McKinney*,
  509 U.S. 25 (1993)...........................................................................................................20, 21

*In the Matter of the Extradition of Alejandro Toledo Manrique*,
  Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal. Mar.
  19, 2020) ..............................................................................................................................8, 9

*In re Request to Commute or Suspend County Jail Sentences*,
  Docket No. 084230 (N.J. Mar. 22, 2020) .................................................................................9

*Masonoff v. DuBois*,
  899 F. Supp. 782 (D. Mass. Sep. 11, 1995) ...........................................................................21

*Shabazz v. Beard*,
  2018 U.S. Dist. LEXIS 31785, 2018 WL 1071173 (E.D. Cal. Feb. 27, 2018).......................21

*United States v. Barkman*,
  2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020)...........................................................9

*United States v. Beck*,
  No. 1:13-CR-186-6, 2019 WL 2716505 (M.D.N.C. June 28, 2019) ......................................14

*United States v. Cantu*,
  No. 1:05-CR-458-12019, 2019 WL 2498923 (S.D. Tex. June 17, 2019)...............................13

*United States v. Cantu-Rivera*,
  Cr. No. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019)..........................................13

*United States v. Matthaei*,
  ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020) ......................................9

*United States v. Perez*,
  ECF No. 62, Case No. 1:19-cr-297 (S.D.N.Y. Mar. 19, 2020)................................................8

*United States v. Redd*,
  97-cr-6, 2020 U.S. Dist. LEXIS 45977 (E.D. Va. Mar. 16, 2020) .........................................13

*United States v. Stephens*,
    ECF No. 2798, Case No. 15-cr-95 (S.D.N.Y. Mar. 19, 2020).................................................8

*Wallis v. Baldwin*,
    70 F.3d 1074 (9th Cir. 1995) ............................................................................................21

*Xochihua-James v. Barr*,
    No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished)......................................................8

**Statutes**

18 U.S.C. 3553.............................................................................................................................12

18 U.S.C. § 3142(g)......................................................................................................................18

18 U.S.C. §3553(a) .....................................................................................................................16

18 U.S.C.§ 3582.............................................................................................................................1

26 U.S.C.§ 7201.............................................................................................................................1

First Step Act of 2018 .............................................................................................................1, 12

§ 3582(c)(1)(A)(i) ........................................................................................................................13

U.S.S.G. § 1B1.13(2) ...................................................................................................................18

USSG § 1B1.13.............................................................................................................................13

**Rules**

Section 3582(c)(1)(A)(i) ..............................................................................................................12

**Other Authorities**

Eighth Amendment ......................................................................................................1, 20, 21, 22

Bureau of Prisons: First Step Act Overview,
    https://www.bop.gov/inmates/fsa/overview.jsp.............................................................13

*BOP Implementing Modified Operations*,
    https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Apr. 2,
    2020). ...............................................................................................................................15

Cary Aspinwall, Keri Blakinger, Abbie Vansickle, and Christie Thompson,
    *Coronavirus Transforming Jails Across the Country*, The Marshall Project,
    Mar. 21, 2020, https://www.themarshallproject.org/2020/03/21/coronavirus-
    transforming-jails-across-the-country........................................................................11

*Cases in the U.S.*, CDC, Mr. 25, 2020, https://www.cdc.gov/coronavirus/2019-
    ncov/cases-updates/cases-in-us.html ...............................................................................2

*CM Lander Joined Members of Congress to Call for Release of At Risk Inmates
    from Federal Jails*, NYC Council, Mar. 22, 2020,
    https://council.nyc.gov/brad-lander/2020/03/22/cm-lander-joined-members-
    of-congress-to-call-for-release-of-at-risk-inmates-from-federal-jails/ ......................6

*Coronavirus in Florida:  Map and Case Count*, N.Y. Times, Apr. 2, 2020,
   https://www.nytimes.com/interactive/2020/us/florida-coronavirus-
   cases.html#county ................................................................................................15

*Coronavirus*, National Public Radio (Mar. 29, 2020),
   https://www.npr.org/sections/coronavirus-live-
   updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-
   americans-could-die-from-the-coronavirus ..........................................................3

*Coronavirus Overview*, WHO, https://www.who.int/health-
   topics/coronavirus#tab_1 (last visited Mar. 31, 2020) ........................................3

*Coronoavirus disease (COVID-19) Pandemic*, WHO,
   https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last
   visited Mar. 31, 2020 ...........................................................................................3

*COVID-19 Test Positive Cases*, BOP,
   https://www.bop.gov/coronavirus/index.jsp (last visited Apr. 2, 2020) ..............17

Ellen Cranley, *Trump is considering releasing elderly, 'totally nonviolent'
   offenders from federal prisons amid coronavirus outbreak*, Business Insider,
   Mar. 22, 2020, https://www.businessinsider.com/trump-consider-coronavirus-
   executive-order-federal-prisons2020-3 .................................................................16

*Federal Bureau of Prisons COVID-19 Action Plan*,
   https://www.bop.gov/resources/news/20200313 covid-19.jsp (last visited Apr.
   2, 2020) .......................................................................................................15, 16, 17

Harvard Health Publishing, *If You Are At Higher Risk, How to Reduce the Risk of
   Infection and What to Do If You Are Sick* (March 2020),
   https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-
   risk.......................................................................................................................14

*How to Protect Yourself*, CDC, https://www.cdc.gov/coronavirus/2019-
   ncov/prepare/prevention.html; *Basic protective measures against the new
   coronavirus* ..........................................................................................................3

John Bowden, *New York City has released 900 inmates in response to
   coronavirus pandemic*, the Hill, Mar. 31, 2020,
   https://thehill.com/homenews/state-watch/490444-new-york-city-has-
   released-900-inmates-in-response-to-coronavirus ................................................10

Justin Wise, *California to release up to 3500 non-violent inmates amid
   coronavirus outbreak*, the Hill, Mar. 31, 2020,
   https://thehill.com/homenews/state-watch/490498-california-to-release-3500-
   non-violent-inmates-amid-coronavirus-outbreak .................................................10

Keri Blackinger & Beth Schwartzapfel, The Marshall Project, *How can prisons
   contain coronavirus when Purell is a contraband?*,
   https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-
   prisons-contain-coronavirus ...............................................................................16

Kimberly Kindy, Emma Brown, & Dalton Bennett, *'Disaster waiting to happen':*
*Thousands of inmates released as jails and prisons face coronavirus threat*,
the Washington Post, Mar. 25, 2020,
https://www.washingtonpost.com/national/disaster-waiting-to-happen-
thousands-of-inmates-released-as-jails-face-coronavirus-
threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html..............................10

Melissa Healy, *Why is coronavirus so much more deadly for men than for*
*women?* Mar. 21, 2020, https://www.latimes.com/science/story/2020-03-
21/why-is-the-coronavirus-more-deadly-for-men-than-for-women ...........................................4

Michael Balsamo & Michael R. Sisak, *Federal inmates to be locked in cells for*
*14 days amid virus*, the Washington Post, Apr. 1, 2020,
https://www.washingtonpost.com/politics/federal-inmates-to-be-locked-in-
cells-for-14-days-amid-virus/2020/04/01/99b9eb22-7457-11ea-ad9b-
254ec99993bc_story.html...............................................................................................11

N.Y.S. Dep't of Health, https://coronavirus.health.ny.gov/home.....................................................3

*People who are at higher risk for severe illness*, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-
higher-risk.html......................................................................................................................12

Samantha Melamed & Mike Newall, With courts closed by pandemic, Philly
police stop low-level arrests to manage jail crowding, The Philadelphia
Inquirer, Mar. 18, 2020,
https://www.inquirer.com/health/coronavirus/philadelphia-police-coronavirus-
covid-pandemic-arrests-jail-overcrowding-larry-krasner-20200317.html ..............................11

Stephen Rex Brown, *'Business as usual' for federal prosecutors despite*
*coronavirus, Nadler writes, calling for release of inmates*, N.Y. Daily News,
Mar. 20, 2020.............................................................................................................................7

Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb*
*Coronavirus Risk*, N.Y. Times, Mar. 23, 2020,
https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-
release.html...............................................................................................................................10

WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-
2019/advice-for-public...............................................................................................................3

*Who Director-General's opening remarks at the media briefing on COVID-19*,
WHO, (March 11, 2020), https://www.who.int/dg/speeches/detail/who-
director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-
march-2020 ................................................................................................................................1

WHO Organization, Clinical Management of Severe Acute Respiratory Infection
(SARI) when COVID-19 Disease is Suspected, March 13, 2020,
https://www.who.int/publications-detail/clinical-management-of-severe-acute-
respiratory-infection-when-novel-coronavirus-(ncov)-infection-is-suspected .........................2

## PRELIMINARY STATEMENT

Lewis Stahl seeks his immediate release from the Federal Prison Camp at Miami ("FCI Miami") to serve the remainder of his custodial term in strict home detention.  He seeks this relief pursuant to 18 U.S.C. § 3582, as modified by the First Step Act, and to protect his Eighth Amendment rights.  The spread of COVID-19 currently poses a threat to all U.S. residents. Inmates are particularly vulnerable because of unsanitary conditions within federal prisons, and their inability to follow established guidelines that lower the likelihood of getting coronavirus. At age 64, ████████████████████████████████████, Mr. Stahl is particularly vulnerable.  His age ███████████ significantly increase his risk of contracting and suffering the most severe health consequences of COVID-19 – hospitalization and death. The outbreak of COVID-19 and Mr. Stahl's ████████████████ while incarcerated are extraordinary and compelling reasons that justify his immediate release from FCI Miami Camp.

## I.  BACKGROUND

On April 1, 2019, Lewis Stahl was convicted of one count of tax evasion in violation of 26 U.S.C. § 7201.  He was sentenced to FCI Miami on September 9, 2019.

On February 24, 2019, Mr. Stahl submitted a Request for Home Confinement to the Bureau of Prisons.  (Exh. A.)  He has not received a response to that request.

## II.  THE CORONAVIRUS PANDEMIC

The United States is facing an unprecedented health crisis.  On March 11, 2020, the Director General of the World Health Organization ("WHO") characterized the spread of a novel coronavirus, COVID-19, as a global pandemic.[1]  COVID-19 is a respiratory virus which can

---

[1] *Who Director-General's opening remarks at the media briefing on COVID-19*, WHO, (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

cause severe symptoms including high fever, severe cough, shortness of breath and pneumonia. According to the WHO, "approximately 14% develop severe disease requiring hospitalization and oxygen support and 5% require admission to an intensive care unit to try to prevent the most severe complications including septic shock – a significant drop in blood pressure that can lead to stroke, heart or respiratory failure, failure of other organs, or death."[2]

### A.     Rapid Spread of COVID-19

COVID-19 is highly infectious.  According to Dr. Chris Beyrer, a leading epidemiologist at Johns Hopkins University, "[O]nly the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity."  (Exh. B, Beyrer Decl. ¶ 10.[3]) Jonathan L. Golob, M.D. a practicing physician and specialist in infectious diseases at the University of Michigan reports that "Nationally, without effective public health interventions, CDC projections indicate about 200 million people in the United States could be infected over the course of the epidemic, with as many as 1.5 million deaths in the most severe projections."  (Exh. C, Golob. Decl. ¶10.)

From its emergence in December 2019 until today, the number of Coronavirus cases has jumped exponentially.  The United States had one case as of January 22, 2020.  As of April 2, 2020, the CDC reported a total of 213,144 cases and 4,513 deaths.[4]  It may kill 200,000

---

[2] WHO Organization, Clinical Management of Severe Acute Respiratory Infection (SARI) when COVID-19 Disease is Suspected, March 13, 2020, https://www.who.int/publications-detail/clinical-management-of-severe-acute-respiratory-infection-when-novel-coronavirus-(ncov)-infection-is-suspected.

[3] The declarations of Chris Beyrer, M.D and Jonathan Louis Golob, M.D. were prepared in connection with litigation unrelated to the instant case, and were previously filed as exhibits to the defendant's Expedited Motion to Revoke Detention Order, No. 1:19-cr-341-DCN (D. Idaho March 18, 2020).

[4] *Cases in the U.S.*, CDC, Apr.2, 2020, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us html.

Americans and infect millions more.[5]  Worldwide, there were 900,306 confirmed cases and

45,693 confirmed deaths as of April 2, 2020.  The virus has impacted individuals in 206

countries, areas, or territories.[6]

### B.    Prevention

COVID-19 spreads from one individual to another through small droplets that can be

transmitted by getting coughed or sneezed on or by touching an object or surface that someone

previously coughed or sneezed on.[7]

The CDC, WHO, and individual state departments of health have stated that the spread of

COVID-19 can be achieved by social distancing.  Social distancing requires, whenever possible,

(1) remaining at home, (2) keeping at least six feet of distance from others, (3) avoiding large

gatherings, (4) covering coughs and sneezes, (5) washing hands frequently or using an alcohol

based rub, and (6) cleaning and disinfecting frequently touched surfaces.[8]

### C.    Individuals at Highest Risk

Dr. Chris Beyrer, has stated under oath regarding COVID-19 that "The overall case

fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality

associated with influenza infection," and "varies significantly depending on the presence of

---

[5] *Bobby Allyn, Fauci Estimates that 100,000 to 200,000 Americans Could Die from the Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

[6] *Coronavirus disease (COVID-19) Pandemic*, WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited Apr. 2, 2020).

[7] *Coronavirus Overview*, WHO, https://www.who.int/health-topics/coronavirus#tab=tab_1 (last visited Mar. 31, 2020).

[8] *See e.g.*, *How to Protect Yourself*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html; *Basic protective measures against the new coronavirus*, WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public; N.Y.S. Dep't of Health, https://coronavirus health ny.gov/home.

certain demographic and health factors." (Exh. B, Beyrer Decl.¶¶ 5-6.) COVID-19 "makes certain populations of people severely ill." (Exh. B, Beyrer Decl.¶ 5; Exh. C, Golob Decl. ¶3.)

Dr. Beyrer also reports that "The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise." (Exh. B, Beyrer Decl. ¶ 6. *See also* Exh. C, Golob Decl. ¶ 4 ("In the highest risk populations, the case fatality rate is about 15%.").)

The Centre for Evidence-Based Medicine reported that most acute viral infections, such as COVID-19, have three short-term effects on cardiovascular disease. Acute viral infections can (1) increase the risk of acute coronary syndromes due to the inflammatory response; (2) depress the myocardium leading to worsening heart failure; and (3) unmask heart arrhythmias.[9]

Men are faring worse than women during this COVID-19 pandemic according to statistics emerging from around the world.[10] Indeed, on Friday, March 20, 2020, the White House COVID-19 Task Force director Dr. Deborah Birx "cited a report from Italy showing that men in nearly every age bracket were dying at higher rates than women."[11] Similarly, an "analysis of all COVID-19 patient profiles in China from December 2019 to February 2020 suggest[ed] that men account[ed] for roughly 60% of those who are infected and become sick."[12] Moreover, the LA Times noted "in a detailed accounting of 44,600 cases in mainland China as of

---

[9] Jason Oke & Carl Heneghan, *Global Covid-19 Case Fatality Rates*, CEBM, Mar. 25, 2020, https://www.cebm.net/global-covid-19-case-fatality-rates/.

[10] *See* Melissa Healy, *Why is coronavirus so much more deadly for men than for women?* Mar. 21, 2020, https://www.latimes.com/science/story/2020-03-21/why-is-the-coronavirus-more-deadly-for-men-than-for-women

[11] *Id.*

[12] *Id.*

Feb. 11, China's Center for Disease Control reported that the fatality rate among men with confirmed infections was roughly 65% higher than it was among women."[13]

Dr. Golob has described the extraordinary measures that may be required to care for those individuals who are most vulnerable: "Most people in the higher risk categories," who contract COVID-19 "will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios, respiratory therapists and intensive care physicians." (Exh. C, Golob Decl. ¶ 6.) "For high risk patients who do not die from COVID- 19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurological damage, and loss of respiratory capacity." (Exh. C, Golob Decl. ¶ 4.)

### D. Vulnerability of Inmates

Dr. Golob confirms that "effective public health measures, including social distancing and hygiene for vulnerable populations, could reduce these numbers." (Exh. C, Golob Decl. ¶ 10.) But these measures are "extremely difficult" in a prison setting. (Exh. B, Beyrer Decl. ¶ 17 ("While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain.").) Indeed, conditions of confinement create the ideal environment for the transmission of contagious disease.

> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater.

---

[13] *Id.*

5

> When infectious diseases are transmitted from person to person by
> droplets, the best initial strategy is to practice social distancing.
> When jailed or imprisoned, people have much less of an
> opportunity to protect themselves by social distancing than they
> would in the community.  Spaces within jails and prisons are often
> also poorly ventilated, which promotes highly efficient spread of
> diseases through droplets.  Placing someone in such a setting
> therefore dramatically reduces their ability to protect themselves
> from being exposed to and acquiring infectious diseases.

(Exh. D, Declaration of Dr. Jaimie Meyer, 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020) at ¶ 9.)

Individuals who are incarcerated are particularly vulnerable.  Former Medical Director at

the Correctional Health Services at Rikers Island Dr. Jonathan Giftos, has described the risks:

> [Jails] are not closed systems; there is a tremendous flux of people
> in and out of the facility, including officers and other staff, who
> live in communities overwhelmed by positive cases.  Mitigating
> efforts such as physical distancing and frequent hand-washing are
> impossible in jails.  And it is impossible to effectively screen and
> isolate people who are symptomatic to protect others in custody . .
> . . .  And if they do become positive, there is very limited medical
> care available to them.  The only measure that will meaningfully
> impact the spread and harm of Coronavirus in the jail-system is to
> depopulate - to release as many as possible to continue their cases
> in the community - with a focus on those at highest risk of
> complications.[14]

When outbreaks occur in prisons, this leads directly to increased spread beyond the

confines of jail.  (*See* Exh. B, Beyrer Dec. ¶ 12.)  "It is therefore an **urgent** priority in this time

of national public health emergency to reduce the number of persons in detention as quickly as

possible."  (Exh. B, Beyrer Dec. ¶ 17 (emphasis added).)

COVID-19 has already appeared in multiple prisons in China.  (*See* Exh. B, Beyrer Dec.

¶ 15.)  COVID-19 has now arrived in our prisons.  The ramifications for both the incarcerated

---

[14] *CM Lander Joined Members of Congress to Call for Release of At Risk Inmates from Federal Jails*, NYC Council,
Mar. 22, 2020, https://council.nyc.gov/brad-lander/2020/03/22/cm-lander-joined-members-of-congress-to-call-for-
release-of-at-risk-inmates-from-federal-jails/.

population and correctional staff will be dire.  "Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities." (Exh. B, Beyrer Dec. ¶ 13.)  Social distancing and decontaminating surfaces is "virtually impossible."  (*Id.*)  Furthermore, "[t]he high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure." (*Id.*)  U.S. Detention Facilities already have a track record of mismanaging infectious diseases (*see id.*), and the fact that it remains business as usual in our jails is highly troubling.  At this moment in our national history there can be no doubt "[r]eleasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." (Exh. B, Beyrer Dec. ¶ 19.)

### E.   Steps Taken by Congress, Courts and Prosecutors to Protect Inmates

As a result of the imminent and devastating consequences of COVID-19 on the inmate population and the need to lower the curve, the President, members of Congress, courts, and prosecutors across the country have recognized the need to release prisoners.  House Judiciary Chair Jerrold Nadler led a team calling on the Southern and Eastern Districts of New York to release at risk inmates from federal jails and to halt arrests for non-violent charges.  In a separate letter to Attorney General William Barr, Nadler wrote:

> We urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.[15]

---

[15] Stephen Rex Brown, *'Business as usual' for federal prosecutors despite coronavirus, Nadler writes, calling for release of inmates*, N.Y. Daily News, Mar. 20, 2020, http://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

Magistrate Judge Nat Cousins in the Northern District of California issued a criminal standing order in light of the novel coronavirus pandemic – Judge Cousins, acknowledging that "[t]his public health crisis is serious and urgent," reopened any detention hearing on the basis of the physical and mental health of the accused.[16]

On March 26, 2020, in response to the coronavirus threat, Attorney General William Barr directed the Bureau of Prisons to increase the use of home confinement among older inmates with underlying conditions as a means to mitigate the spread of coronavirus within the country's prison system.  Attorney General Barr stated "I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic . . . [F]or some eligible inmates, home confinement might be more effective in protecting their health."  (Exh. E.)

Courts throughout the United States, recognizing the extraordinary risk posed to the elderly and to those with underlying health conditions, are releasing inmates.  *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Perez*, ECF No. 62, Case No. 1:19-cr-297 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, ECF No. 2798, Case No. 15-cr-95 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic") *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal., Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants

---

[16] Criminal Case Standing Order Re:  Procedure for Review of Detention Orders in Light of Coronavirus Pandemic, (N.D. Cal. Mar. 16, 2020) (Cousins, M.J.).

bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Matthaei*, ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility").

At least one federal judicial officer has recently dismissed BOP's Impenetrable Fortress strategy. *See In re Manrique*, 2020 WL 1307109, at *1 (N.D. Cal., Mar. 19, 2020). Magistrate Judge Hixson in the Northern District of California found the idea of an impenetrable fortress to be a fiction:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late. *Id*. at *1.

Some of the state efforts to release of inmates in response to the coronavirus threat include:

- California plans to release 3500 inmates;[17]

- New York City has released 900 inmates;[18]

- New Jersey will release 1000 inmates;[19]

- In Ohio, Cuyahoga County officials launched an early-release program two weeks ago after the county jail's medical director identified hundreds of county prisoners with serious health conditions.  The result:  In a matter of days, the county jail population dropped from nearly 1,900 to less than 1,300.[20]

- In Washington County, Oregon, outside Portland, **more than 120 inmates** were released from the local jail, freeing up enough space for each remaining inmate to stay in their own cell.

- Racine, Wisconsin, **Sheriff Christopher Schmaling** has directed the local jail to stop accepting all new prisoners except those accused of violent felonies or of misdemeanor crimes, such as domestic violence, that pose a threat to public safety

- In Mercer County, in far western Pennsylvania, the county jail released 60 of 308 inmates — nearly one in five — to free up two cell blocks for the quarantine of anyone exposed or infected with the coronavirus. [21]

- Pennsylvania District Attorney Larry Krasner advised that his office would seek to release most individuals charged with nonviolent offenses or misdemeanors without requiring they post bail.  In a further effort to reduce crowding in jails, Krasner also encouraged police officers to exercise discretion before charging individuals.[22]

---

[17] Justin Wise, *California to release up to 3500 non-violent inmates amid coronavirus outbreak*, the Hill, Mar. 31, 2020, https://thehill.com/homenews/state-watch/490498-california-to-release-3500-non-violent-inmates-amid-coronavirus-outbreak.

[18] John Bowden, *New York City has released 900 inmates in response to coronavirus pandemic*, the Hill, Mar. 31, 2020, https://thehill.com/homenews/state-watch/490444-new-york-city-has-released-900-inmates-in-response-to-coronavirus.

[19] Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times, Mar. 23, 2020, https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release html.

[20] Kimberly Kindy, Emma Brown, & Dalton Bennett, *'Disaster waiting to happen': Thousands of inmates released as jails and prisons face coronavirus threat*, the Washington Post, Mar. 25, 2020, https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

[21] *Id.*

[22] Samantha Melamed & Mike Newall, *With courts closed by pandemic, Philly police stop low-level arrests to manage jail crowding*, The Philadelphia Inquirer, Mar. 18, 2020,

- Public defenders and prosecutors in Tulsa, Oklahoma worked together to release 75 people from jail in a single day.[23]

As of March 31, 2020, 94 inmates and staff at Bureau of Prisons facilities in 13 states have tested positive for COVID-19.  FCI Oakdale Louisiana has been hit particularly hard – two inmates have died, a corrections officer is in intensive care, and 24 inmates and staff have tested positive for the virus.  An additional 9 others are in the hospital and suspected of having the disease, 32 are in isolation with symptoms and 82 have been quarantined because of possible exposure.[24]

## III.  CONDITIONS AT MIAMI CAMP

Mr. Stahl currently resides in a dormitory room that measures approximately 40 feet by 100 feet.  Approximately 67 inmates reside in that single room in double high bunk beds.  The 67 inmates have access to two bathrooms – one in the unit and one in the computer room.  The bathroom in the unit contains 3 urinals, 4 stalls, and approximately 6 showers.  FCI Miami does not supply hand sanitizer to the inmates.  (Affirmation of Patricia A. Pileggi, Exh. F, ¶¶ 3-5.)

The unit contains a shared kitchen, laundry room and sink.  The unit also shares a central air conditioning unit.  (Exh. F, ¶ 6.)

The floors are washed once a day.  The cleaner that is used does not appear to contain bleach.  (Exh. F, ¶ 7.)

---

https://www.inquirer.com/health/coronavirus/philadelphia-police-coronavirus-covid-pandemic-arrests-jail-overcrowding-larry-krasner-20200317 html.

[23] Cary Aspinwall, Keri Blakinger, Abbie Vansickle, and Christie Thompson, *Coronavirus Transforming Jails Across the Country*, The Marshall Project, Mar. 21, 2020, https://www.themarshallproject.org/2020/03/21/coronavirus-transforming-jails-across-the-country.

[24] Michael Balsamo & Michael R. Sisak, *Federal inmates to be locked in cells for 14 days amid virus*, the Washington Post, Apr. 1, 2020, https://www.washingtonpost.com/politics/federal-inmates-to-be-locked-in-cells-for-14-days-amid-virus/2020/04/01/99b9eb22-7457-11ea-ad9b-254ec99993bc_story html.

The telephone area consists of 5 telephones next to each other in a 1 ½ foot area.  The phones are in use 12 hours per day.  The telephone area is wiped down once a day.  As a result, phones and handsets are dirty.  A few inmates are coughing.  As of March 25, 2020, Mr. Stahl was unaware of any inmates having their temperature taken or of inmates being tested for COVID-19.  (Exh. F, ¶¶ 8-10.)

The inmates eat, mingle, and sleep together.  Although the inmates have been told to maintain a "social distance," it is impossible to do so in the hallways, food areas, sleep areas and bathrooms.  (Exh. F, ¶ 11.)

Aside from those occasions that they search trash or inmate lockers, corrections officers do not wear gloves or masks.  (Exh. F, ¶ 12.)

In response to the pandemic, the Bureau of Prisons has terminated all social and legal visits.  Mr. Stahl has not seen his family or an attorney since March 8, 2020.  On March 31, 2020, the Bureau of Prisons announced that all inmates will be restricted to their cells or quarters except for visits to the commissary, laundry, showers, and telephone.  (Exh. F, ¶¶ 13-14.)

## IV.  LEWIS STAHL



Mr. Stahl is 64 and ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████  His age ██████████████ put him at high risk for severe illness if he succumbs to COVID-19.[25]

---

[25] *See People who are at higher risk for severe illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

## V.     THE FIRST STEP ACT

On December 21, 2018, President Trump signed into law the First Step Act of 2018.  The act was the culmination of a bi-partisan effort to improve criminal justice outcomes as well as to reduce the size of the federal prison population.[26]

Now, Section 3582(c)(1)(A)(i) permits the Court to modify an imposed term of imprisonment if: (1) 30 days has elapsed from the warden's receipt of a request for a modification of the terms of imprisonment; (2) extraordinary and compelling reasons warrant such a reduction; (3) the Court has taken into account sentencing factors set forth in 18 U.S.C. § 3553; and (4) the reduction is consistent with applicable Sentencing Commission policy statements.  No longer is the Court divested of jurisdiction after sentencing a defendant.  Upon the proper showing and in light of extraordinary circumstances this Court is permitted to release an inmate.

Following the First Step Act's passage, courts have held that they are vested with discretion to find "extraordinary and compelling reasons" for a reduction in sentence that go beyond the technical requirements set forth in BOP regulations and USSG § 1B1.13, application note 1 (setting forth such "extraordinary and compelling reasons" as "terminal illness" and a guideline that a prisoner over 65 years old should be released early when he has "served at least 10 years or 75 percent of his sentence").  *See United States v. Redd*, 97-cr-6, 2020 U.S. Dist. LEXIS 45977 at *7-12 (E.D. Va. Mar. 16, 2020) (district courts vested with discretion to find "extraordinary and compelling reasons" beyond the technical requirements of the guidelines manual or BOP regulations); *United States v. Cantu*, No. 1:05-CR-458-12019, WL 2498923, at *5 (S.D. Tex. June 17, 2019); *United States v. Cantu-Rivera*, Cr. No. H-89-204, 2019 WL

---

[26] *See* Bureau of Prisons: First Step Act Overview, https://www.bop.gov/inmates/fsa/overview.jsp.

2578272, at *2 n.1 (S.D. Tex. June 24, 2019); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

A.      **Extraordinary and Compelling Reasons Warrant a Reduction Sentence**

Mr. Stahl, like every person in this country, is in danger of contracting a pernicious, aggressive life-threatening virus.  Unlike most people in this country, however, he has no way to practice the social distancing and sheltered protective measures that are mandated by governments and health officials throughout the nation and which promise some hope of surviving the consequences of infection.  Indeed, Mr. Stahl is prevented from such practices due to the living conditions in which he is incarcerated.

Mr. Stahl has several conditions that put him at higher risk for getting very sick.  His age alone increases his risk. ███████████████████████████████████████ ████████████████████████████████████ it is critical that he limit his contact with other individuals, maintain social distancing, wash his hands frequently, and insure that high-touch surfaces such as counters, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, and tablets are sanitized.[27]

It is becoming clear that BOP's facilities and Staff are soon facing a tidal wave of infections because BOP houses a large number of prisoners in very tight quarters across this nation.  Once the virus spreads inside BOP facilities, there will be little to stop fortifications that will nominally deny entry to outside infestation by among other things, ending inmate visitation

---

[27] Harvard Health Publishing, *If You Are At Higher Risk, How to Reduce the Risk of Infection and What to Do If You Are Sick* (March 2020),  https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk.

and requiring the Staff to self-report infections.[28]  BOP's strategy flies in the face of every health expert and governmental order in the country.

The BOP has explicitly acknowledged that there will be "more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff."[29]  While the BOP's guidelines generally discuss "social distancing," suspending social and legal visits for at least 30 days, screening of staff and inmates, and quarantining symptomatic inmates and asymptomatic inmates with exposure risk factors, there do not appear to be any systematic efforts to implement such practices at Miami USP. While the BOP has suspended social and legal visits to prevent the introduction of the virus, there are gaping holes in this approach.  Specifically, Miami USP staff live and reside in or around Miami-Dade and Broward counties, which have, as of March 29, 2020, a combined 3,763 confirmed COVID-19 cases and 101 COVID-19 deaths.  Miami-Dade and Broward counties account for more than half of all of the cases in Florida.[30]

Importantly, the BOP's procedures at Miami USP do not currently involve many of the basic preventative steps counseled by health experts, the CDC, and the President of the United States.  As of March 31, 2020, neither the FCI Miami Camp staff nor the inmates are using masks or gloves within the complex.  FCI Miami Camp has not administered any COVID-19 testing, and it is unlikely that necessary testing kits are even available for such testing in a prison setting.  Commonly touched surfaces are not cleaned and disinfected regularly.  Miami USP staff

---

[28] *See BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Apr. 2, 2020).

[29] *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Apr. 2, 2020).

[30] *Coronavirus in Florida:  Map and Case Count*, N.Y. Times, Apr. 2, 2020, https://www.nytimes.com/interactive/2020/us/florida-coronavirus-cases.html#county.

have not made hand sanitizers available to the inmates.  Indeed, in many correctional institutions, hand sanitizer is considered contraband.[31]  While inmates can, and do, wash their hands, it is difficult, if not impossible at times, to line up to use the washing facilities on a regular basis.  As exemplified by Mr. Stahl's sleeping and eating conditions within FCI Miami Camp "social distancing" is not practiced in advance of and after eating or while inmates are sleeping.

The BOP's current guidance states that plans depend on each facility's physical layout and that its procedures will be reevaluated in 30 days.  Specifically, the BOP notes that for the next 30 days, "the BOP will implement nationwide modified operations to maximize social distancing and limit group gatherings in our facilities.  For example, depending on the facility's population and physical layout, the institution may implement staggered meal times, recreation, etc.  These modifications will be reevaluated in 30 days."[32]

Recognizing the imminent threat posed to inmates, on Sunday March 22 the President of the United States discussed openly that he is considering releasing all federal prisoners who are elderly and non-violent, presumably based on recommendations received by his Coronavirus Task Force.[33]  BOP's "Impenetrable Fortress" strategy is not going to work, and senior people in this administration must be doubting its ability to protect BOP's elderly, non-violent prisoners.

While BOP has not yet ruled on Lewis Stahl's individual request, submitted on February 24, 2020, the Court need not and should not wait for such rulings.  Waiting for action on the part of BOP would be futile because BOP appears to take the position—both in its published material

---

[31] *See* Keri Blackinger & Beth Schwartzapfel, The Marshall Project, *How can prisons contain coronavirus when Purell is a contraband?*, ABA Journal, Mar. 13, 2020, https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[32] *Federal Bureau of Prisons COVID-19 Action Plan*, *supra* note 29.

[33] *See* Ellen Cranley, *Trump is considering releasing elderly, 'totally nonviolent' offenders from federal prisons amid coronavirus outbreak*, Business Insider, Mar. 22, 2020, https://www.businessinsider.com/trump-consider-coronavirus-executive-order-federal-prisons2020-3.

and in other cases that courts have considered in the last week—that it is capable of protecting its

inmates and staff from the pernicious effects of COVID-19 by way of its "Impenetrable Fortress"

strategy.[34]  This strategy is wholly inadequate to protect Lewis Stahl, other prisoners, and BOP

staff, as discussed above.  Just in the last few days, new positive cases at BOP—prisoners and

staff—have been reported, and the numbers go up by the hours.[35]  Sadly, it is highly likely that

untested and unreported cases already exist within FCI Miami Camp.

**B.**   **The Sentence Reduction is Consistent with the Section 3553(a) Factors**

The sentencing factors set forth in 18 U.S.C. §3553(a) warrant a reduction for Mr. Stahl.

The applicable factors are:

> (1)     the nature and circumstances of the offense and the history
> and characteristics of the defendant;

> (2)     the need for the sentence imposed –

>> (A)     to reflect the seriousness of the offense, to promote
>> respect for the law, and to provide just punishment for the
>> offense;

>> (B)     to afford adequate deterrence to criminal conduct;

>> (C)     to protect the public from further crimes of the
>> defendant; and

>> (D)     to provide the defendant with needed educational
>> or vocational training, medical care or other correctional
>> treatment in the most effective manner.

> (6)     the need to avoid unwarranted sentencing disparities
> among defendants with similar records who have been found guilty of
> similar conduct; and

>> (7)     the need to provide restitution to any victims of the
>> offense.

---

[34] *See Federal Bureau of Prisons COVID-19 Action Plan*, *supra* note 29.

[35] *COVID-19 Test Positive Cases*, BOP, https://www.bop.gov/coronavirus/index.jsp (last checked Apr. 2, 2020).

The first factor is "the nature and circumstances of the offense and the history and characteristics of the defendant."  Mr. Stahl was convicted of a non-violent offense, one count of tax evasion.  He has demonstrated good conduct and rehabilitation.  He has paid the restitution ordered by the Court.  As the Court will recall from the sentencing proceedings, Mr. Stahl is a good person with a life long history of generosity toward his family and his employees.  He is devoted to his community and to charitable causes.  His medical technology company, under his leadership, could provide tremendous assistance to scientists who wish to track individuals who have COVID-19.

The second factor is the need for the sentence imposed to serve the enumerated purposes of punishment.  The Court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes."  When sentencing Mr. Stahl, the Court did not intend to expose Mr. Stahl, as a result of his incarceration, to significant risk of severe illness or death. Mr. Stahl is completely unable to do those things that are essential, in light of his age ███, to prevent serious illness or death.  Further, the Court did not intend that Mr. Stahl be deprived of the ability to see his family for months at a time.  This is a sentence that is "greater than necessary" to comply with the statutory purposes of punishment.

The final relevant factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The conditions under which Mr. Stahl is serving his sentence present an unwarranted sentence disparity from other individuals convicted of similar offenses.  He is unable to see his family, get recreation, or go outside.  He is largely confined to one room with 67 other individuals, 24 hours per day, under conditions which are, in light of the highly contagious COVID-19, unsanitary and likely to lead to serious illness or death.

### C.      A Sentence Reduction Is Consistent with Sentencing Commission Policy

The Commission's policy statement provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

Clearly Mr. Stahl is not a danger to the safety of others or to the community.  He has an extraordinary history of helping his family, employees and his community.  Nothing in his history comes remotely close to suggesting that he is a danger to others.

### D.      A Sentence Reduction Is Consistent with Attorney General Barr's Directive

Attorney General Barr identified six factors relevant to the decision to permit home confinement to individual inmates:  (1) the agent and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention guidelines; (2) the security level of the facility currently holding the inmate; (3) the inmate's conduct in prison; (4) the inmate's score under PATTERN;[36] (5) whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism; and (6) the inmate's crime of conviction.

Taking each of these factors into account, Mr. Stahl should be permitted to complete his sentence in home confinement.  Lewis Stahl is 64 years of age, ██████████████ ████████████████████████████████████████████.  Under the CDC Guidelines he is at high risk for severe COVID-19 illness.  Miami FCI Camp is the lowest level of security.  Mr. Stahl's conduct at the Camp has been exemplary.  He has had absolutely no contact with inmates who have engaged in violent or gang related activity.  Mr. Stahl has received a minimum score under PATTERN.  He is a software engineer and the owner of a medical technology company, NextGen Management LLC.  That company is still in

---

[36] Prisoner Assessment Tool Targeting Estimated Risk and Needs

business and requires his skills as a software engineer and as the Chief Executive Officer of the company.  Mr. Stahl was convicted of one count of personal tax evasion.  Accurate amended tax returns have been filed, and all taxes have been fully paid.

If his sentence is reduced to home confinement, Mr. Stahl will reside with his wife Helene only.  No other individuals reside with him.  His wife has been in social isolation for the past three weeks.  She has no symptoms of COVID-19.  A release to home confinement will substantially decrease Mr. Stahl's likelihood of contracting COVID-19.

## VI.   UNREASONABLE RISK OF EXPOSURE TO COVID-19 IS CRUEL AND UNUSUAL PUNISHMENT

*Helling v. McKinney*, 509 U.S. 25 (1993), and subsequent cases reveal that the BOP must take sufficient protective measures to prevent contraction of COVID-19 in the jail population. Unreasonable risk of COVID-19 contraction will, in itself, constitute an Eighth Amendment violation.  In *Helling*, a plaintiff alleged that he was assigned to a cell with another inmate who smoked five packs of cigarettes per day.  509 U.S. at 28.  At issue was whether this exposure to environmental tobacco smoke (ETS) could constitute a valid claim under the Eighth Amendment, even though the plaintiff had not yet suffered harm.  *Id.* at 30.  The Supreme Court upheld the decision of the Court of Appeals, finding that the plaintiff stated "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health."  *Id.* at 35.

In *Helling,* the Supreme Court tacitly acknowledged other situations in which environmental factors can pose an unreasonable risk to an inmate's health, including exposure to 'infectious maladies such as hepatitis and venereal disease' caused by overcrowding, unsafe

drinking water, and 'toxic or other substances." *See Allen v. Kramer*, No. 1:15-cv-01609, 2016
WL 4613360, at *7 (E.D. Cal. Aug. 17, 2016) (quoting *Helling*, 509 U.S. at 33, 35.)

*Helling* has been applied to unreasonable risks posed by asbestos, *Wallis v. Baldwin*, 70
F.3d 1074 (9th Cir. 1995), "contagious diseases caused by overcrowding conditions," *Brown v.
Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004); contaminated water, *Carroll v.
DeTella*, 255 F.3d 470, 472 (7th Cir. 2001); compelled use of chemical toilets, *Masonoff v.
DuBois*, 899 F. Supp. 782, 797 (D. Mass. Sep. 11, 1995), [and] paint toxins, *Crawford v.
Coughlin*, 43 F. Supp. 2d 319, 325 (W.D.N.Y. 1999)." *Allen*, 2016 WL 4613360, at *8.

Perhaps most applicable to COVID-19 are cases that have applied *Helling* to the
exposure of inmates to the lung ailment Valley Fever in California.  Relying on *Helling*, *Allen v.
Kramer* concluded that an inmate plaintiff had alleged an Eighth Amendment violation because
he was housed in the Central Valley where there was a relatively high risk of contracting Valley
Fever.  *See Allen*, 2016 WL 4613360, at *1, 11.  *Shabazz v. Beard* adopted *Allen*'s reasoning
and came to the same conclusion.  No. 1:15–cv–00881, 2018 WL 1071173, at *7-9 (E.D. Cal.
Feb. 27, 2018) (reversed on other grounds).

Officials who fail to adequately protect inmates from the risk of contracting COVID-19
violate the Eighth Amendment's proscription against cruel and unusual punishment.  Where, as
here, the protections from COVID-19 for inmates are insufficient, whether for the jail population
as a whole or for particularly at-risk individuals, it raises significant Eighth Amendment
violation issues.  Lewis Stahl is in a number of high risk categories:  he is in his 60's, ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ and he is male.  The BOP is not taking sufficient precautions to prevent
the transmission of the COVID-19 virus within FCI Miami Camp.  Accordingly, the BOP's

Eighth Amendment violations warrant the immediate release of Lewis Stahl to strict home detention.

When sentencing Mr. Stahl, the Court did not intend to place him at significant risk of serious illness or death.  Nor did the Court intend to deprive him of the ability to see his family for substantial periods of time.  These conditions amount to cruel and unusual punishment and justify his immediate release.

## CONCLUSION

Accordingly, upon consideration of the Lewis Stahl's extraordinary and compelling showing, we ask this court to act quickly and decisively by releasing him from custody and permitting him to serve the remainder of his sentence in strict home detention in order to protect his health and rights.

Date:  April 3, 2020                          Respectfully submitted,

                                              Schiff Hardin LLP
                                              1185 Sixth Avenue, 30th Floor
                                              New York, New York 10103
                                              212.745.0839



                                              By: _Patricia A. Pileggi_____
                                                    Patricia A. Pileggi
                                                    Attorney for Defendant Lewis A. Stahl


NY\54317188 2

22